```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
 2                            AT TACOMA

 3

 4   A.G. DESIGN & ASSOCIATES,     )   Docket No. CR07-5158FDB
                                   )
 5          Plaintiff,             )   Tacoma, Washington
                                   )   June 28, 2007
 6        vs.                      )
                                   )
 7   TRAINMAN LANTERN COMPANY,     )   USCA Case No. 2007-1481
     INC., et al.,                 )
 8                                 )
            Defendants.            )
 9   _____)

10

11              TRANSCRIPT OF PRELIMINARY INJUNCTION
             BEFORE THE HONORABLE FRANKLIN D. BURGESS
12              UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Plaintiff:        ROBERT L. CHRISTIE
                               THOMAS P. MILLER
15                             Christie Law Group PLLC
                               2100 Westlake Ave. N.
16                             Seattle, Washington 98109

17                             HALFRED MARTIN HOFHERR
                               Law Office of Hal M. Hofherr
18                             2509 Cedarwood Ave., Ste 4
                               Bellingham, Washington 98225
19
     For the Defendants:       JEFFERSON COULTER, II
20                             JULIE WIEDIGER
                               Axios Law Group
21                             17225 Westlake Ave N., Ste 150
                               Seattle, Washington 98109
22
     Court Reporter:           Teri Hendrix
23                             Union Station Courthouse, Rm 3130
                               1717 Pacific Avenue
24                             Tacoma, Washington  98402
                               (253) 882-3831
25   Proceedings recorded by mechanical stenography, transcript
     produced by Reporter on computer.
```

1                        I N D E X

2    OPENING REMARKS:                                    Page

3        By Mr. Mr. Christie.........................    5
         By Mr. Coulter.............................    11
4
                  INDEX OF WITNESSES
5                 ==================

6    WITNESSES:                                          Page

7     ALLEN HERRINGTON
             Direct Examination.......................    20
8            Cross-Examination........................    68
             Redirect Examination.....................    85
9
10   JENS JORGENSEN, Ph.D.
             Direct Examination.......................    88
11           Cross-Examination........................   102
             Redirect Examination.....................   110
12
13   MARCUS MUKAI
             Direct Examination.......................   112
14           Cross-Examination........................   140
             Redirect Examination.....................   155
15

16   CLOSING REMARKS:                                    Page

17       By Mr. Mr. Christie.........................   166
         By Mr. Coulter.............................    170
18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS
                           ===================
2
  EXHIBITS:                                                Page
3

4  Plaintiff's No.  9                                       49
   Plaintiff's No.  14                                      53
5  Plaintiff's No.  16                                      57
   Plaintiff's No.  18                                      57
6  Plaintiff's No.  3, 4, 5, 6, 7, 8, 10, 11, 12, 13       62
   Plaintiff's No.  15, 17, 19, 20, 21, 22, 23             62
7  Defendants'  No.  A-13                                   74
   Defendants'  No.  A-15                                  143
8  Defendants'  No.  A-16                                  144
   Defendants'  No.  A-6                                   152
9  Defendants'  No.  A-7                                   153
   Plaintiff's No.  1                                      176
10 Plaintiff's No.  2                                      176

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THURSDAY,  JUNE 28, 2007 - 9:00 A.M.

2                                 * * *

3         THE CLERK:  This is in the matter of A.G. Design

4    versus Trainman Lantern, Cause CO7-5158FDB.

5

6       Counsel, please make an appearance for the record.

7         MR. CHRISTIE:  Good morning, Your Honor.  My name is

8    Bob Christie.  I am here on behalf of plaintiff, A.G. Design

9    and Associates, LLC.  I am seated at counsel table with

10   Mr. Herrington, who's the principal of that company; my

11   cocounsel, Hal Hofherr.

12        MR. HOFHERR:  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. CHRISTIE:  And Tom Miller, a lawyer in my office.

15        MR. MILLER:  Good morning, Your Honor.

16        THE COURT:  All right.

17        MR. COULTER:  Good morning, Your Honor.  I am

18   Jefferson Coulter.  I am appearing today on behalf of American

19   Lantern Company and Marcus Mukai.  This is Mr. Mukai, and to

20   the end is cocounsel Julie Wiediger.

21        THE COURT:  All right.  We are here to take some

22   testimony that would go to the issue as to whether or not

23   injunctive relief would be appropriate in this matter.  I

24   guess the question is how quickly can we get to that point.  I

25   don't want to turn this into a trial of the matter.  Normally,

1  in these kind of cases, it makes as much sense to do it all at

2  one time.

3      I looked at the list of witnesses, and it seemed to be the

4  same folks, with the one exception, Dr. Jorgensen.  He is on

5  both witness lists.  It seems like we have the same three

6  witnesses as to this whole matter right here.

7      I don't know in terms of trial whether it would expand

8  beyond that or not, I don't know.  Of course, the court is

9  limited as to how much time I can give you.  I am hoping

10  whatever it is, we can wrap it up the better part of the

11  morning or shortly in the afternoon.  So I will kind of hold

12  you to something like that.  If we don't get through today,

13  there may be something wrong as to what we are trying to do

14  here today.  Okay.

15      All right, so any other witness other than the ones I have

16  mentioned.  I think Dr. Jorgensen, since he's on both sides of

17  this matter, I guess in terms of his testimony, there's no

18  reason to reinvent these questions as we go.  We will do it

19  that way.

20      All right.

21          MR. CHRISTIE:  Ready to proceed when you are, Your

22  Honor.

23          THE COURT:  All right.  Then if you want to give me

24  an opening of some kind I will hear that.

25          MR. CHRISTIE:  That's what I thought I would do.

1    Thank you, Your Honor.

2        Good morning.  I represent A.G. Design & Associates.  That

3    company is headed up by my client Al Herrington.  He is

4    present here, along with other members of his family.

5        This is a family-owned company.  His wife Linda is central

6    in the company, as well as his daughter Shelly Wallenberg.

7        What you will hear, and what we've presented in our

8    written materials, will demonstrate to you that Al Herrington

9    is at heart an inventor; he's an engineer.  He has worked on

10   other products that have been patented, but the focus of this

11   case is on a historically significant item, and one that is of

12   great import to the trainmen that work in the rail yards

13   throughout this company and Canada.  We are talking about a

14   device called the Trainman Lantern.

15       I have put up on the screen to illustrate to you what we

16   are going to talk about today.  The device on the left side of

17   the screen, the orange device --

18           THE COURT:  Just one second.  Let's see if she can

19   bring up my screen.  Well, as usual we are in quality control

20   mode.

21       I can kind of see it over the top here, so go ahead.

22           MR. CHRISTIE:  Mine wasn't working and I figured out

23   the blue cable on the bottom had been unplugged.  So if that's

24   your issue, I can fix it for you.

25           THE COURT:  Keep going, we are going to call somebody

1  and see if they are working today, too.

2          MR. CHRISTIE:  I think it would be helpful, because I

3  plan to show a number of items to illustrate testimony during

4  the course of this.  If it would make it easier, I would be

5  happy to pass up my illustratives so you can look at the real

6  thing.

7          THE COURT:  All right.

8          MR. CHRISTIE:  Your Honor, it is going to work far

9  better for you than any picture I can put up.

10      What you are holding is the accused device.  That is a

11  device that has been manufactured by Mr. Mukai in a company

12  that he formed.

13      The device you now have in your hand is the patented

14  device.  That is the device that Mr. Herrington developed over

15  a five-year period.

16          Beginning in 1998, Mr. Herrington began working with

17  Burlington Northern Santa Fe Railroad in order to develop a

18  better trainman light.

19      The light, and I will show you this one, this particular

20  light, which is on the court's screen, is one invented by a

21  company named Star Lantern.  This was the predominant light in

22  the railroad industry for years.

23      As you will hear in the testimony, there was some

24  shortcomings with this light.  It wasn't bright enough.  And

25  the key to these lights -- and you will hear some testimony on

1   this -- is they serve two functions.  They serve one function
2   as being literally a spotlight or flashlight with the central
3   focus being; the other purpose they that display light
4   laterally around the side, because trainmen use these to
5   signal the conductor from literally hundreds of yards away.
6       So the effort that Mr. Herrington undertook was to develop
7   a better light.  He did this over the course of five years.
8   And finally, in June of 2003 sold, for the first time, the
9   patented device, the official Trainman Lantern, the device you
10  hold in your hand, Your Honor.
11      That device was -- the application for patent was
12  submitted in May of 2004, 11 months after first sale.  The
13  patent was issued on October 10, 2006.
14      Mr. Mukai entered the picture in 2000.  That's when
15  Mr. Herrington met Mr. Mukai.  Mr. Mukai is an actor by
16  background.  He's a salesman.  He has no engineering expertise
17  whatsoever.
18      He met Mr. Herrington, and they entered into two different
19  agreements.  They entered into an agreement, a nonexclusive
20  sales agreement, essentially making Mr. Mukai a sales
21  representative.  You will see that agreement.  I have the
22  original with me.  It's signed by both parties.
23      That agreement, which was executed on April 1 of 2003,
24  gave Mr. Mukai unfettered access to all proprietary company
25  information; customer lists, design drawings, everything that

1    you would possibly conceive of as being important to A.G.
2    Design.
3        There was a second document entered into between the
4    parties.  In August of 2003, Mr. Mukai and his brother Scott
5    executed, and Mr. Herrington also executed, a letter of
6    intent, an intent to purchase A.G. Designs.
7        Over the course of time that followed, again, unfettered
8    access was given to Mr. Mukai to design drawings, pricing,
9    customer lists; every piece of proprietary information of this
10   company.
11       What you see in the yellow device is an underhanded,
12   illegal effort by Mr. Mukai, using all of the proprietary
13   information that he gathered from my client, to have some one
14   build him an identical lantern.  This lantern is identical
15   down to the hundredth of an inch in terms of its design
16   parameters.
17       With no trial and error effort, no engineering effort, it
18   is a copy in the truest sense of the word.
19       We have brought an action that is based both in federal
20   law under trademark -- excuse me, under patent law, under
21   Title 35.  We have also brought pendant or supplemental state
22   law claims based on the written agreements.  Those are not at
23   issue here, but they have some significance to demonstrate the
24   intent of Mr. Mukai in undertaking what we believe is a little
25   infringement, and certainly infringement that meets the

1  Doctrine of Equivalents.

2       There is one difference in these lenses.  If the court

3  will take both of them and look at their lenses, I will

4  explain that.  You will see in the lens of the orange device,

5  the patented device, that there are four circles or ports.

6  Those circles or ports allow some of the light, Your Honor,

7  from the central beam to be reflected laterally.

8       Those ports are not present in Mr. Mukai's device.  The

9  ports, according to all the examination by experts, including

10  Dr. Jorgensen, do no more than supplement or augment the

11  amount of light that comes out the side.

12       They are in no way critical to the functionality of the

13  lateral light, which is created by the exact same method in

14  both devices; and that is a series of LED bulbs that reflect

15  light off of this pebbled surface of this clear plastic ring.

16       You will hear counsel argue for Mr. Mukai that they have

17  no equivalent function to the ports.  They will have to admit

18  that with the exception of the ports, the devices are

19  identical in every respect whatsoever.

20       You will hear him argue that under the Doctrine of

21  Equivalents, they have no equivalent to the ports.  You will

22  also perhaps hear an argument of prosecution estoppel.  I am

23  prepared to talk about that, prepared to talk about the Festo

24  case and any nuances of that.

25       What you will see is that every function and feature of

1   the patented device is copied exactly by Mr. Mukai.  He has

2   penetrated Mr. Herrington's marketplace.  He has done so

3   because he knows every customer.  He dealt with them in a

4   capacity as an independent sales representative.

5      He has now invaded that marketplace with this infringing

6   device.  He has caused severe damage to Mr. Herrington's

7   business.  He has done so in an illegal, frankly underhanded

8   manner.

9      We ask that this court stop that, freeze his actions until

10  we can get this matter fully litigated, because irreparable

11  harm is occurring to Mr. Herrington and his business every

12  day.

13      Thank you.  I will proceed with testimony after their

14  opening.

15         THE COURT:  Any opening?

16         MR. COULTER:  Yes.  I would also like to provide you

17  with another example.  You have the infringing device and you

18  have the patented device.  I would also like to give you this.

19      Do you have the ability to see on your screen yet?

20         THE COURT:  I think so.  Try and see if it comes up

21  or you can bring it here and I will take a look at it the same

22  way.

23      Is there something different from the two I have here?

24         MR. COULTER:  This one is the Star Lantern, which is

25  the prior lantern that was being used.

1          THE COURT:  All right.

2          MR. COULTER:  I wanted you to have that as an

3     example.

4          This is the copy of the alleged patented device that

5     has ports in it that was being sold in 2002.

6       This is the actual copy of my client's product.

7          THE COURT:  All right.  I am seeing little difference

8     between these two.  Are they the same?

9          MR. COULTER:  May I see them for a moment?

10      They are somewhat different.

11         THE COURT:  It's being represented this one is yours?

12         MR. COULTER:  Right.

13         THE COURT:  Is that right, Mr. Christie?

14         MR. CHRISTIE:  Yes, Your Honor, my client purchased

15     the one that I gave you.

16         THE COURT:  Other than being a bigger handle, I am

17     not seeing the issue.

18         MR. COULTER:  This is the final product, but for

19     purposes of this --

20         THE COURT:  It's the same.  Then this is the patent.

21         MR. COULTER:  This is the patented product.

22         THE COURT:  Okay.

23         MR. COULTER:  Your Honor, if I could, I would like

24     you to be able to look at both of these, because there's some

25     differences between them.

1    This is the 2002 version, and this is the patented

2    version.

3            THE COURT:  All right.

4            MR. COULTER:  For purposes of what we'd like to talk

5    about --

6            MR. CHRISTIE:  Your Honor, if it's not a problem,

7    could I look at the other one that he's handing up?

8            THE COURT:  This?

9            MR. CHRISTIE:  No, it would just be his orange one.

10   Thank you.

11           MR. COULTER:  Your Honor, the 2002 prototype, I

12   probably made it more confusing, but --

13           THE COURT:  This is plaintiff's 2002 you are saying?

14           MR. COULTER:  2002.

15           THE COURT:  They are the same, right?

16           MR. COULTER:  This is the client's, my client's

17   product.

18           THE COURT:  But it's the same, virtually the same?

19           MR. COULTER:  They are very similar, yes.

20           THE COURT:  Let me have whatever you want me to see.

21           MR. COULTER:  Okay, we'll have the final one.

22           THE COURT:  All right.

23           MR. COULTER:  There's a lot of lights in front of

24   you, but they are all we have relevant to this discussion.

25       So we've heard counsel for A.G. discuss the relationship

1   between the parties and the copying of this product.

2        What we are really here to talk about today is just

3   whether there are grounds for preliminary injunction.  Counsel

4   is going to need to establish they have a strong likelihood of

5   success on the merits, and this patent, in order to establish

6   that, they have to show this patent very likely infringes -- I

7   mean, I am sorry, my client's product very likely infringes

8   their patent; and they have to show this possibility of

9   irreparable harm.

10       They can't show that.  The reason they can't show that is

11  because in order to establish the likelihood of success they

12  need to show literal infringement or infringement by Doctrine

13  of Equivalents.  They haven't met that burden in their

14  pleadings, and they haven't met that burden in anything they

15  presented to this court.

16       When we look at the patent, we see the claims listed.  And

17  the very first claim has a number of dependent elements in it.

18  If you look at their lantern their claim covers the reflector

19  and a variety things about the reflector, and it also includes

20  the plurality of LEDs which are underneath the reflector that

21  distribute light out laterally.  They would like you to just

22  look at that and look at my client's product and see if they

23  are similar.

24       However, when they submitted a patent for that kind of a

25  claim, it was rejected by the PTO.  In order to get the

1  patent, they had to add a number of dependent claims to it
2  that limited substantially the scope of the patent.
3      What they ended up with was a patent for a trainman
4  lantern that had a reflector lens, that had a plurality of
5  ports, that directed light downward, and a number of LEDs
6  reflected onto the reflector from the bottom, and that
7  reflector had to contain a plurality of ports.
8      It was a dependent claim.  They were required to clear
9  that claim and amend their patent in order to get -- in order
10  to get the patent they had to amend it in such a way that it
11  included this plurality of ports.
12      It's not a minor issue.  If their patent as issued were
13  now allowed to encompass anything that had a reflective
14  surface, it would encompass the Star Lantern product in front
15  of you.  Star Lantern was cited against them as prior art.
16      So under their sort of a theory, they come forward and
17  they have a patented device and -- the alleged infringing
18  device.  The alleged infringing device does not contain
19  plurality of ports.  It's a requirement, a dependent claim.
20  Therefore it cannot be a literal infringement.  It has to read
21  on every -- each and every claim -- each and every element of
22  the claim exactly.  It doesn't read exactly.  It cannot as a
23  matter of law be a literal infringement.
24      The only thing available to them now is the Doctrine of
25  Equivalents, and they have to show that it does equivalently

1  the same thing.  It doesn't, because what their product does
2  is takes the light from the center bulb and it reflects it
3  downwards to provide this augmented light system.  Then the
4  LEDs reflect onto a reflector with the ports.

5      Quite frankly it was very innovative at the time they came
6  up with it.  It was prior to LEDs being used in a widespread
7  manner.  It probably saved electricity.  It had a lot of
8  innovative features.  The ports were what was innovative, not
9  the lantern.

10     The shape of the lantern and the size of the lantern and
11 the bail of the lantern, it's what trainman lanterns look
12 like.

13     So they can't establish there's a literal infringement
14 because it doesn't read on every claim.

15     They can't establish that the Doctrine of Equivalents
16 applies because, number one, it doesn't do the equivalent
17 thing; and number two, Festo, which the plaintiff did not
18 discuss in its brief, clearly states that if you narrowed your
19 claims, you can't come back later and try and use it to -- you
20 can't assert a claim that you've given up against potential
21 infringers later on.

22     Their claim as stated would also apply to Star Lantern
23 Company, because Star Lantern has a product out that's very
24 similar to my client's.

25     If they are able to pursue this claim against my client,

1    then they can pursue their claim against Star Lantern.    And

2    Star Lantern was originally cited against them to not allow

3    them to have this patent, and they rewrote their claims to

4    avoid infringing on Star Lantern.

5        So it becomes a circular argument.    By allowing them to

6    get a preliminary injunction here, you allow them to get a

7    preliminary injunction against every other marketer, which has

8    a dramatic anti-competitive effect.

9        So they can't establish a likelihood of literal

10   infringement, can't establish the Doctrine of Equivalents

11   applies to the infringement of this patent.

12       There's substantial vulnerabilities to -- they have a

13   substantial vulnerability to unenforceability issue because

14   the patent may be invalid because it was sold prior to the

15   year before they applied for the patent.

16       They applied for the patent in 2004.    But if you look at

17   the 2002 prototype in front of you, which they admit that it's

18   a prototype and they rely on the experimentation doctrine

19   that's cited in the City of Elizabeth or comes from the City

20   of Elizabeth, a hundred year old, well established case.    It's

21   still good law.    And the City of Elizabeth specifically said

22   that any attempt to use a patented device for profit and not

23   by way of experiment for a period longer than one year before

24   the application would deprive the inventor of his right to a

25   patent.

1          They didn't have this patent in the workshop.   They

2    weren't developing it.   It wasn't under any kind of

3    nondisclosure agreement.

4          They were selling the patented device in a way that

5    included all the claims of their subsequent patent in 2004 at

6    least two years before, well before the statutory bar for

7    patentability.

8          So their prototype has plurality of ports in it that

9    directs the light downwards to augment the secondary light

10    source and then -- you start off with three rounded ports, and

11    then they had four rounded ports, and then they had four flat

12    ports, and then they decided let's go ahead and patent this.

13          They did not cite any of these prior disclosures to the

14    patent office.   And we wonder why, and it's probably because

15    the patent examiner would have considered it a public

16    disclosure or would have considered it prior art and would

17    have decided against it and not allow the patent to issue.

18          So where they can't establish a clear likelihood of

19    success, we can show very good defenses to what they are

20    raising, where we can show there's a very good chance there's

21    been a public disclosure or a public sale prior to the

22    statutory bar; and we would ask that this court not grant the

23    preliminary injunction pending discovery and the final trial

24    on the merits of the case.

25          Thank you, Your Honor.

1          THE COURT:  All right.  I will hear testimony.  I

2  suppose we are down to the functionality to some extent, and

3  it sounds like the expert --

4          MR. CHRISTIE:  Yes, Your Honor, and it is my plan as

5  well to call Mr. Mukai as an adverse witness.

6          THE COURT:  All right.

7          MR. CHRISTIE:  I would like to begin with calling Al

8  Herrington to the stand.

9          THE COURT:  All right.

10     Let me have you just come around and be sworn.  If I could

11  have you raise your right hand, please.

12      ALLEN HERRRINGTON, called as a witness, duly sworn.

13          THE COURT:  Just come around and take the witness

14  chair.  All right.

15          MR. COULTER:  Your Honor, could I just for

16  clarification purposes find out what documents Mr. Herrington

17  is taking to the stand?

18          THE COURT:  Any particular exhibits?

19          MR. CHRISTIE:  Mr. Herrington has with him -- whether

20  or not he looks at them, it depends on whether he needs

21  them -- he's got a written chronology of events which counsel

22  is free to look at, a copy of both his original declaration

23  and supplemental declaration filed in this court for purposes

24  to aid him in expediting the testimony.

25          THE COURT:  Any issue with that, or do you want him

1  to testify from what his memory is and whether he needs to

2  refresh it for any reason?

3        MR. COULTER:  Your Honor, I'd prefer that he testify

4  from memory.

5        THE COURT:  All right.  Well, then you can just set

6  them aside.  If you need to refer to your notes, you can.

7        MR. CHRISTIE:  Thank you, Your Honor.

8     If you need to refer them, Mr. Herrington, just let the

9  court know and let us know that it would help you to look at

10  them.  Okay.

11        THE WITNESS:  All right.

12                    DIRECT EXAMINATION

13  BY MR. CHRISTIE:

14  **Q.**  Sir, go ahead and state for Judge Burgess your full name

15  and your residence address.

16  **A.**  Full name is Allen Herrington.  And my residence is 3405

17  Marion Place, in Greenbank, Washington, 98253.

18  **Q.**  What is your relationship to A.G. Design & Associates, an

19  LLC, the plaintiff in this lawsuit?

20  **A.**  I am the patent and CEO.

21  **Q.**  Who works in that business with you?

22  **A.**  We are a family run business; my wife, my two daughters,

23  and my son-in-law.

24  **Q.**  All of those that are present here in the courtroom?

25  **A.**  Yes, they are.

1  Q.  Would you give Judge Burgess a little background on your
2  education, your work experience, and what bought you to A.G.
3  Design, and then we will talk specifically about the
4  development of the trainman lantern?
5  A.  My education is I graduated from the engineering school.
6  I was in the military for five years, and I have had several
7  inventions.
8      I was in the lighting business, highway lighting business
9  for several years.  That's how I got contacted by Burlington
10  Northern, because they seen some of my projects and they came
11  to me to ask me to solve a problem for them.
12  Q.  Now, let's talk specifically about Burlington Northern.
13  You say they came to you.  When was it that Burlington
14  Northern first came to you?
15  A.  That was 1998.
16  Q.  What was the issue as far as Burlington Northern was
17  concerned that they presented you with?
18  A.  Well, the first issue was they had a blue light that they
19  used for flagging their cars at night.  It was a safety item.
20  When you have a locomotive broke down or a car broke down,
21  they would put a blue flashing light on it so the men wouldn't
22  come hooking a train to it or move it.  It shows the car is
23  out of operation and to stay away from it.
24      They were having problems seeing that blue light because
25  the manufacturer was making a blue light that was really dim.

1    And they went back to the manufacturer, and the manufacturer

2    wouldn't make any changes.

3        So they asked me if I could make those changes, and I did.

4    And they liked those changes.  So after that, they came to me

5    and asked me if I would join the committee that they had

6    formed to build a new trainman lantern for the industry.

7            MR. CHRISTIE:  Your Honor, if you don't mind, you

8    have one copy of what's being called the old Star Lantern.

9    Perhaps I could hand the other one to the witness.

10           THE COURT:  Okay, yes.

11           MR. CHRISTIE:  Yes, Your Honor, it's the same as the

12    one you have in your hand.

13           THE COURT:  All right.

14    BY MR. CHRISTIE:

15    **Q.**  Mr. Herrington, you have a lantern in your hand.  The

16    court may not be as familiar with the history and use of the

17    trainman lantern by trainman as you are.

18        Would you briefly outline what you have come to learn from

19    your work in the industry about how a trainman uses a lantern?

20    **A.**  Well, the lantern, when people say lantern, they think

21    it's just a light, but it has several functions.

22        One, it has a function where they have to have a spot beam

23    in which they can see at night and they can read the numbers

24    off the side of a car from a minimum of 50 feet back.  So it's

25    got to be a bright light.

1          Another thing they have to do, they have to have black or
2    white.  So when they make a signal, like they are signaling
3    the engineer to say stop the train, they have to swing the
4    lantern back and forth, and the engineer has got to see that
5    so he can bring the train to a stop.
6          They have got five different signals that they use.  Like
7    if they wanted to release the air brakes, they would circle in
8    let the engineer know, telling him to release the air brakes.
9    Like I say, there's five different signals.  So the lantern
10   does a lot of different functions.
11         This particular lantern, which they have used for years,
12   they were having a lot of problem with it because the men had
13   to walk backwards in using the signals, because they could
14   only see the lateral light from one side of the lantern.  When
15   they would walk backwards they will trip on the ballasts and
16   fall.  So they wanted a lantern that had 360 degree lighting.
17         They went back to the manufacturer, told them that.  The
18   manufacturer said no, we are happy with our lantern, we are
19   going to stay with our lantern.
20         So then they decided we'll build our own lantern.  So
21   that's when they came to me and said this is what we need to
22   see, 360 degree lighting.  We need to see a longer spot.  They
23   gave me the parameters of what they wanted to see, and that's
24   what I went to work on and built for them.
25   Q.  Now, the orange lantern is your patented device; is that

1    correct?

2    **A.**  Yes, that's correct.

3              MR. CHRISTIE:  Your Honor, there you go, you have

4    that one in your hand.

5              THE COURT:  This is the patented, but the same

6    lantern.

7    **A.**  Yes.

8    BY MR. CHRISTIE:

9    **Q.**  Perhaps, since you have two of them, if the court doesn't

10   mind maybe you could share one of them with Mr. Herrington so

11   he can talk about it while you are looking at it.

12        Mr. Herrington, I would like to take you through the

13   process by which you engineered and developed what turned out

14   to be the device for which you sought and procured a patent,

15   okay.

16   **A.**  All right.

17   **Q.**  And I want to take one issue right up front, and then we

18   will talk about the details of the design.

19   **A.**  Okay.

20   **Q.**  Counsel has handed up to the court what he's calling a

21   2002 prototype.  I showed that to you and that may be the one

22   that you now have in your hand.

23   **A.**  That's it right here.

24   **Q.**  So the device you have in your hand, is that the patented

25   device?

1   **A.** No, it is not.

2   **Q.** Explain what that is to the court and when it was

3   developed.

4   **A.** Well, it's strictly a prototype device.  What I was trying

5   to do when I was working on lateral light, the very first

6   models that I had, several models that I made and sold, did

7   not have the ports in the reflector or did not have these

8   balls in the reflector.  They just had -- I put four LEDs, and

9   I had the reflector where it was vacuum metallized on both

10  sides, and I had four LEDs on the underside of the reflector.

11  So when the light would hit it, it would shine out laterally.

12      After several of those were out in the marketplace, we

13  found that -- we put one on the ground and backed the

14  locomotive up to see how far we could get away from it before

15  we lost sight of the light.  And it was not quite far enough

16  that they -- they wanted to see it a little bit farther.  So

17  that's when I went to work on trying to figure out how to

18  increase the lateral light.

19      So first of all what I did, I took the reflector and I cut

20  slots in it.  And that worked, but it was very difficult to

21  manufacture something like that.

22      So then after a while, I found out if I drilled holes in

23  it, if I drilled a hole evenly with the center of the

24  incandescent light bulb, then it would capture the light from

25  the element out to the textured case, and it would augment the

1   light to the signal which cured the problem.  But the next
2   problem was, is naturally with the holes drilled in there it
3   was no longer moisture resistant.
4       So then what I did is in prototype design only, I glued
5   some acrylic balls, I went over to Tap Plastics in Bellevue
6   and I bought some three-quarter inch plastic balls and acrylic
7   glue and I glued the balls in the reflector.  And I did that
8   to approximately six lanterns.
9       I never ever sold one of these because I knew it wouldn't
10  stand up in the environment.
11  Q.  Is that one of the six?
12  A.  Yes, it is.
13  Q.  How would that have come to be in the possession of Mukai?
14  A.  I shared everything with Marcus because he worked with me.
15      MR. CHRISTIE:  Your Honor, I may come back to that.
16      What I would like to do is focus on his device and take
17  you through the various features of it.
18      What I am putting up here is a page from the actual patent
19  itself, a diagram.  I may just reference certain aspects of
20  this, and then you are free to look obviously at the diagram
21  or your actual exemplar as he explains this.
22  BY MR. CHRISTIE:
23  Q.  Mr. Herrington, when did you first sell your patented
24  device; when was that prototype through the experimental
25  process in its final form, and when was that first sold?

**A.**  Around the middle part of June -- not June, but in 2003,

because I didn't even have the -- I invented the ports, and

then what I had to do was get the windows made to fit the

reflector, have the reflector made.

     And so I went to my toolmaker, and I asked him to give me

a bid on making the reflector with the windows in it.  And

then after that, we ordered product to go into production with

the windows in it.  And that wasn't until the middle part of

2003.

**Q.**  If it refreshes your recollection, you make mention of who

you first sold the lanterns to and the date of that sale in

your declaration on page 3, line 5.

     Why don't you take a look at that?

**A.**  I remember it was Florida East Coast Railway, I believe.

**Q.**  I would like to have you see if that refreshes your

recollection on the actual date of that sale?

          THE COURT:  Is there an exhibit number you have in

your --

          MR. CHRISTIE:  The document for the sale is not in

there.  I am referencing him to the statement he made to that

effect in his declaration.

          THE COURT:  All right.

**A.**  What page is that on?

BY MR. CHRISTIE:

**Q.**  Page 3 of your original declaration at line 5 and 6.  If

1  that refreshes your recollection on the date of first sale to

2  Florida East Coast?

3  **A.**  June 16.

4  **Q.**  June 16, 2003?

5  **A.**  Yeah.

6  **Q.**  The date on which you made application for the patent was

7  what date?

8  **A.**  That was in May of 2004, I believe.  I am not very good on

9  dates.

10  **Q.**  If you'll look at your declaration, it so indicates.  The

11  same place in your declaration, the next sentence on page 3?

12  **A.**  May 11, 2004.

13          MR. CHRISTIE:  Your Honor, in the materials there is

14  a copy of the entire patent wrapper.  I don't think there's

15  any dispute between the parties but that 11, 2004 was the date

16  of application.

17          THE COURT:  All right.

18  BY MR. CHRISTIE:

19  **Q.**  While we are talking about the process of developing this,

20  let me take you to your device itself and ask you about some

21  of the features and functionality, and explain to the court

22  how it was that you came to develop that.

23      Let's talk first, if we could, about the reflector itself,

24  and about the bilateral lighting system, the two-directional

25  lighting system that you developed.

1  **A.**  Okay.  Well, the reflector itself is --

2  **Q.**  This would be this device right --

3        MR. CHRISTIE:  The reflector he's referring to, Your

4  Honor, is this surface right here (indicating).

5  **A.**  Are we talking about the cage part?

6  BY MR. CHRISTIE:

7  **Q.**  Yes.

8  **A.**  Sorry, I thought you were talking about the actual

9  reflector.

10  **Q.**  Let's talk about the reflector itself.

11  **A.**  Reflector itself?

12  **Q.**  Yes.  If it helps you to disassemble that to demonstrate

13  it, feel free to do that.

14  **A.**  Well, the reflector itself, it actually does two different

15  things.  The lower half of the reflector is what creates your

16  spot beam for greater distance.

17      The prismatic part of the reflector, it collects the light

18  so it can be -- the person on the other end looking at you can

19  see a larger light, direct light.  Like if you take this one

20  with the small reflector in it, when somebody looked at it, it

21  would be like looking at somebody walking with a flashlight or

22  working with a flashlight.

23      And you take this one and look at it, you would see a much

24  larger beam because a lot of times they have to point this

25  light at the engineer and circle it so they are not shining it

1  in their eyes.  The engineer has to see that it's a very

2  bright big light so they understand the instruction of what

3  they need to do with the train.

4      So this reflector has actually those two functions, and

5  then when I added the lateral light to it, it became three

6  functions.

7  Q.  Okay.  While we are still talking about the reflector, I

8  see on the surface of the reflector that it has a number of

9  facets or flat areas.  Do you see that?

10  A.  Right.

11  Q.  They don't go all the way down to the base.  What I would

12  like to --

13          MR. CHRISTIE:  Also, Your Honor, if I may, I have

14  another copy of Mr. Mukai's lantern.  You have one as well.

15  May I share this with my client so he has both of them in his

16  hand?

17          THE COURT:  Yes.

18  BY MR. CHRISTIE:

19  Q.  What was the process that you went through to come up with

20  that particular reflector that has the facet pattern that is

21  depicted in it partway down and no facets at the bottom.  Just

22  explain that please to the court.

23  A.  Well, what I did is when you are in the lighting business,

24  naturally you look at everything out there that's available to

25  mankind as far as what other lighting companies are developing

in their lighting, so you get an idea of what they are trying
to do and what you are trying to do.

When I found the design for the prismatic effect and then
the spot effect, that was what we needed to incorporate into
our lantern to create that brightness that the railroad was
looking for.

**Q.**  If you would look please at the reflector of Mr. Mukai's
device and contrast it with the reflector of your device,
granted you have a prototype that has balls in it.  Other than
the difference between the balls and eventually the windows,
is there a difference between the prototype and your final
patented device?

**A.**  No.  Not at all.

**Q.**  Okay.  Is there any difference that you are able to
ascertain between the two reflectors, other than the port
windows that are in your final product?

**A.**  No, it's an exact copy.

**Q.**  Literally right down to the number of facets in each?

**A.**  Exactly.

**Q.**  Now, if you would go ahead and explain to the court, you
talked about directional lighting coming out of the main spot,
and then you described another lighting pattern coming out
laterally for signaling purposes.

**A.**  Uh-huh.

**Q.**  Explain to the court how you developed that particular

1  lighting and what functionality of your device allows that to

2  occur?

3  **A.**  Do you want me to explain it on Mukai's or mine or both?

4  **Q.**  Well, is there any difference?

5  **A.**  Well, the only difference is Mukai's copied mine right to

6  the "T" as far as having the LEDs behind the light cage where

7  I have the LEDs behind the light cage.  The textured cage here

8  which augments the light, if you have neon light you will see

9  where it has got a textured cage over to augment the light

10  out.  Basically that's what the texture does here.  When the

11  LED shines into the back of the reflector housing, then it

12  comes off the reflector housing and the light is reflected in

13  the texture which creates, at nighttime if it's real dark, you

14  would just see a real big glow of light out there; so the

15  signal, people could see it and the engineers could see it.

16      The only other difference in mine and Mukai's is he left

17  the windows out, where I had the windows in mine.

18  **Q.**  Now, in your reflector in your device, you have you a

19  reflective surface on the back side of the device where the

20  LEDs are located?

21  **A.**  Yes.

22  **Q.**  Is it the same with respect to Mr. Mukai's?

23  **A.**  Yes, it is.

24  **Q.**  Your LEDs are placed such that they don't have any -- they

25  are situated opposite reflective surface as opposed to any

1  sort of port window, correct?

2  **A.**  They are situated between the windows, because the purpose

3  of them is to shine onto the reflective surface just like

4  Mukai has done with his.

5  **Q.**  From a functionality standpoint, is there any difference

6  in the way that the LEDs reflect off the back side of the

7  reflector and display light laterally between the two devices?

8  **A.**  Not at all.

9  **Q.**  Now, you talked about the pebbling surface on that clear

10 portion of it.  How did you come up with that idea?

11 **A.**  Well, that's a good question, because I tried several

12 different things.  I made different panels.  I tried different

13 plastics.

14     I finally ended up, and I bought a sand blaster and did

15 some sandblasting on clear acrylic plastic.  And then I found

16 out that that would work once I sandblasted that plastic.

17     Once I did that, and when we went to tooling, I had the

18 toolmaker build the roughness in the tool.  So every time the

19 tool was shot, it's made out of polycarbonate, every time it

20 was shot, instead of coming out clear, it would come out with

21 a textured cage on it.

22 **Q.**  Now, I am going to put up -- this is a page out of

23 Dr. Jorgensen's report.  It's for illustrative purposes.  It's

24 just a photograph, Your Honor, of the same thing you are

25 looking at with the actual devices.

1      Have you had a chance to examine the textured surface of

2  your device versus Mr. Mukai's device?

3  **A.**  Yes, I have.

4  **Q.**  Is there any difference that you can ascertain?

5  **A.**  No.

6  **Q.**  Now, I also notice the pebbling surface on yours is on the

7  outside as opposed to the inside, and that that's the same

8  with Mr. Mukai's device.  Why did you put the pebble surface

9  on the outside?

10  **A.**  Just preference on tooling, makes it easier when they are

11  building the tool.

12  **Q.**  Now, let's talk, continue on, you have a ring at the end

13  of your device, a rubber ring.  Mr. Mukai's device has one

14  that is of different color.  Is there any functional

15  difference at all between the purpose that those rings serve?

16  **A.**  No. The purpose of the ring, it has two different

17  purposes.  One, it holds the reflector into the contact

18  housing.  But the main purpose is when the men get on and off

19  the locomotive, they are always hitting the light on the side

20  of the car.  So what we found in our first R and D models and

21  prototyping, if it didn't have a bumper, they would break the

22  reflector.  And we had several of them, hundreds of them that

23  did not have a bumper, where when they get on and off the

24  locomotive it would end up breaking the reflector.  So that's

25  what brought us to build the bumper for the reflector.

1  **Q.** Now, if you unscrew the heads from both lights -- and go
2  ahead and do that if you would please.
3  **A.** (Complying).
4  **Q.** In looking at the two lights themselves, is there any
5  difference in the dimensions or thread size of the battery
6  cases and the heads?  In other words, are they
7  interchangeable?
8  **A.** Do they interchange?
9  **Q.** Yes.
10 **A.** Well, they will screw on to each other, yeah.
11 **Q.** Now, looking at -- is there any difference in thread size
12 that you can ascertain?
13 **A.** The thread side?
14 **Q.** Yes.  Why don't you tell the court what you just did and
15 show it to him?
16 **A.** I just screwed his head assembly on to mine, on to my
17 body.
18 **Q.** All right.  Now, let's take a further look at the head
19 assembly?
20      MR. COULTER:  Could I object at this moment?  He was
21 unable to screw the head on the other way as well.  I think
22 this line of questioning is a little bit misleading.
23      THE COURT:  You can get back to that in
24 cross-examination, I guess, but I am trying to follow along
25 here if I can.

1     Go ahead.

2   BY MR. CHRISTIE:

3   **Q.**  Mr. Herrington, let's come back to counsel's point, were

4   you able to screw the head of your light on to Mr. Mukai's

5   battery case?

6   **A.**  The threads are almost identical, but it's a tight fit.

7   If I forced it, yeah, it would go.

8   **Q.**  So you just --

9   **A.**  That's my head on Mukai's case.

10  **Q.**  Why don't you show that to the court?

11  **A.**  (Complying).

12  **Q.**  Thank you.  Now, let's look at the heads themselves, and I

13  am going to direct you to a portion of the heads that's

14  depicted in these two photographs that are now on the screen.

15  Tell the court about what you did to come up with the design

16  for the head, including the electronics that power the LEDs,

17  and then contrast that if you could, please, to Mr. Mukai's

18  device?

19  **A.**  You have to have contact plates for the battery.  The

20  battery makes contact to the bottom of the housing, so you

21  could further carry the electricity to the LEDs off to the

22  switch and to the center bulb.

23     So what I had to do, I had to develop what we call a

24  contact plate that slips inside the housing.  And then on the

25  contact plate, there's two different stainless steel contacts

1   that are riveted to the bottom.  Underneath the rivets are
2   attached where you can plug the wires onto or solder wires
3   onto.  This is very important because you have your center
4   post of your battery and then your offside post.

5       This is not a very good battery to display that, but as
6   you can see, he's done exactly the same.  Everything is the
7   same; the alignment marks, the contact housing.  Absolutely no
8   difference whatsoever.

9   Q.  If you were to remove the front, if you were to take the
10  front ring off and remove the reflector in the way that's
11  depicted in these photographs that are now before the court,
12  what -- explain to the court what's going on electronically
13  behind yours and how that contrasts with Mr. Mukai's?

14  A.  As you can see, there's a circuit board in there that has
15  four LEDs and four resistors.  What the resistors do, they
16  regulate the power to the LEDs to determine the brightness of
17  the LEDs.  In other words, if you have a LED that's designed
18  to run at 30 milliamps, what you have to do is you have a
19  formula where you formulate the battery power to the LED and
20  measure the forward voltage of the LED and determine the
21  resistor size.  And each LED has its own resistor and that way
22  you are getting maximum light out of the LED.

23      So what I have in here is a circuit board where there's
24  mounted four LEDs and four resistors, one for each LED.

25  Q.  Tell us what you see in Mr. Mukai's.

**A.** As far as Mr. Mukai's, you can see it's absolutely identical to mine but just a different color circuit board, but he's done the four LEDs and four resistors.

**Q.** Explain to the court what you did in order to come up with a calculation for four LEDs and resistors of the kind you just described.  How did that come about?

**A.** Well, that's all field testing, working in the field.  I worked with a committee of men; trainmen and switchmen, brakemen, engineers, conductors.  And we would do several days of field testing to determine brightness, what could be used, what they needed.

We did questionnaires.  We sent questionnaires out to different trainmen shacks all over the United States, had people fill out what they want to see in a light.

I compiled a foot deep worth of documents saying this is what they wanted to see in a lantern.  And then we tried to build the lantern to meet that.  Some of them we couldn't meet, the specs we couldn't meet, but some of them we could.

We tried to find the lantern that was going to be the lantern of the future and the lantern that all railroads would want to use and all men would want to use.

And that's how this all came about.  It wasn't an overnight thing.  It was many years of work.

**Q.** Let me ask you while we are still focused on the head of the device.  The orientation of the LEDs opposite the

1  reflective surface on Mr. Mukai's device and your device, are

2  they identical?

3  **A.**  Yes, they are.

4  **Q.**  Now, I want to focus on another couple aspects of it.

5  Let's talk about the battery cage if we could while you have

6  them apart.  Specifically, let's focus on the handle and how

7  that handle is mounted to the device.

8      Can you explain to Judge Burgess how you went about

9  designing this particular handle, and let's focus initially on

10  the handle and the variation in the size of the grip of that

11  handle.

12  **A.**  Well, first I would like to go back to the Star Lantern

13  that they were using prior to us and talk about a handle.  You

14  see Star has four positions on the handle and nothing in

15  between.  And the problem with this, is they use a piece of

16  spring steel in here with a nail in it, and then they have got

17  plastic indentations.  Well, what happens after several months

18  of use, these little indentations wear off, and then the

19  lanterns just flip around in the grease and then they have to

20  replace the handle to the complete lantern.

21  **Q.**  Why don't you explain for the court what you came to

22  understand in terms of the significance of being able to move

23  the handle to various positions and how you tried to

24  incorporate that into your design?

25  **A.**  In working with the trainmen out in the field and seeing

1  what they had to do with a lantern, the switchmen, brakemen,

2  they are also responsible for a lot of different duties of

3  changing the O rings on the air hoses at night.  And they

4  also, if they got a bad knuckle on a train, the knuckle that

5  hooks the trains together, if they get a bad knuckle they have

6  to change the knuckle out.  Well, a lot of times they have to

7  be hand free operation, so they have to have a light that's

8  bright enough so they can hang it up and be able to point it

9  at their work and not have to be worrying about holding onto a

10 light.  So they wanted a handle you could put in any position

11 where they could get it into a hanging position where they

12 could point it on their work and be able to continue working

13 on the train.

14     The Star Lantern didn't do this, okay.  I had to develop a

15 system that would do that now.

16 **Q.**  Let's go ahead while we are talking about that, and let's

17 focus on, very specifically, on that mounting system?

18 **A.**  Okay, this was very difficult, because what happens if you

19 have a nut and a washer against a piece of metal, and you

20 turn, let's say we are turning the handle clockwise, the nut

21 on the one side has a tendency to turn clockwise, the nut on

22 the other side has a tendency to turn counterclockwise, and

23 what will happen, this nut will tighten, this nut will loosen.

24 So we had to overcome that.

25 **Q.**  If it helps you, I have put up on the screen an exploded

 1  photograph of both Mr. Mukai's device and your device.  Feel

 2  free to point to any features of your device that help in this

 3  design process.

 4  **A.**  What I did on my device, I found, and this was after

 5  months of work of every type of different design you could

 6  think of, I found if I put a very hard wear washer behind the

 7  metal, and then I put a nylon bushing, if I drilled out the

 8  handle and installed a nylon bushing that was approximately 15

 9  to 20 thousandths wider than the metal itself, and then I went

10  with a lock washer on the outside of that, and then a lock nut

11  on the outside of that.  Then if I torqued this down to a

12  certain specification I could create a drag on the handle and

13  it still would not touch the nuts or tighten the nuts up.

14  **Q.**  Could you give the court a sense of how many different

15  efforts or designs or variations you went through in order to

16  perfect this particular design?

17  **A.**  It was a lot of work.  We had knobs.  We had bushings.  I

18  tried all types of different things.  But the problem is the

19  knobs one, the guys didn't like the knobs because it would

20  catch in their grip at night when they are trying to pull it

21  out of their grip.  They would complain about that and want to

22  get rid of the knobs and get something smaller.

23      I tried a lot of different configurations.  Finally, after

24  out of maybe 20 or 30 attempts, I came up with that particular

25  way to do this.

1  **Q.** Have you had a chance to take apart and examine the system

2  utilized in Mr. Mukai's device for the exact same purpose?

3  **A.** I have.

4  **Q.** What have you determined?

5  **A.** It's identical.

6  **Q.** Identical in terms of every washer, type of washer?

7  **A.** Every washer, bushing, everything.

8  **Q.** Now, let's talk about the balance of the handle itself and

9  whether or not there is any significance in your design to the

10  size of the grip on the handle.  If so, please explain that to

11  the court.

12  **A.** The way the handle is made is if you notice we have a

13  bigger part here and then a smaller part here and then nothing

14  over here.

15     If you have something that's less than a half inch in

16  diameter, you have no grip in your hand, and it makes

17  everything really heavy.  When you are carrying the lantern

18  this is the user position.

19     So with a one inch grip in the user position when they are

20  carrying the lantern, it makes the lantern lighter.  It takes

21  away from carpal tunnel.

22     So this handle is actually designed by a Ph.D. in

23  ergonomics that worked for Burlington Northern Santa Fe.

24  **Q.** You worked with him to come up with that particular

25  design?

1  **A.**  Yes, I did.  He designed the grip part.  I designed the

2  handle.

3  **Q.**  Now, if you'll look at Mr. Mukai's handle, we actually

4  have two different handles.  We have the handle on the device

5  that we brought into court and then the one that he handed up

6  to the judge.

7      Why don't you tell me what you see in the device of

8  Mr. Mukai's that you brought into court?

9  **A.**  Well, as you can see, Mukai knew of this because of

10  naturally working with me for a couple of years and working

11  with BNSF and also Lawrence Fleischer who developed and

12  invented this, he knew that it had to be an ergonomic design.

13      So what he did was took that one inch and went all the way

14  around.  I imagine what happened when he started showing this

15  to the revs out there, they came back and said this is way too

16  big, we got to cut down on it.  So then he went down to the

17  smaller handle and moved the grips off side to the user

18  position.

19  **Q.**  So the device that's in front of the court is actually

20  closer in terms of using two different dimensions of grip than

21  the one that you originally purchased?

22  **A.**  Right.

23  **Q.**  Now, the outer texture surface of the battery case itself

24  in your device has some roughness to it, some texture, it's

25  not smooth like the Star Lantern, the actual case itself?

1  A.   Yeah.

2  Q.   Star Lantern being smooth.   Was there a reason for that?

3  A.   No, because theirs is made out of a different plastic.

4  It's more than likely a polypropylene, which is a very cheap

5  plastic.

6       Ours is a polycarbonate, where you have to use a great

7  deal more heat to form it.   And there's no reason for the

8  texture, just the way it comes out of the hole.

9  Q.   Have you had a chance to look at the texture present on

10  Mr. Mukai's battery case?

11  A.   The same as ours, but I believe this is a PC more than a

12  polycarbonate.

13  Q.   Does that make it a cheaper product to manufacture?

14  A.   Yes.

15  Q.   From your evaluation of your own product and the one that

16  was patented, the one the judge has not the prototype of

17  Mr. Mukai's, can you discern any difference between them other

18  than the port windows we've talked about?

19  A.   Not at all.

20  Q.   In terms of the functionality of them, is there any

21  difference?

22  A.   It does the same thing.

23  Q.   I want to spend a little bit of time if I can talking

24  about the history of your relationship with Mr. Mukai.

25            MR. CHRISTIE:   Your Honor, if I could direct you

1  please to Exhibit 9 in our materials and ask the witness to

2  please look at Exhibit 9.

3  BY MR. CHRISTIE:

4  Q.  How did you come to do business with Mr. Mukai?

5  A.  I was in the process of developing a rechargeable battery,

6  and I went to a company over in Bellevue that I had dealt with

7  before, that was called Sage Electronics.  And I worked with a

8  fellow by the name of George Sage.  I went and contacted

9  George Sage to work with me on developing a rechargeable

10  battery.  At that time I found out that George had sold his

11  business to another fellow by the name of Jay Fuhr, and Marcus

12  worked for Jay.

13  Q.  Did you eventually -- we are limited on time, and I want

14  to try to be expeditious for the court's benefit -- did you

15  eventually come to enter into a business arrangement with

16  Mr. Mukai?

17  A.  Yes, I did.

18  Q.  Can you identify what Exhibit 9 is?

19  A.  It's a non-exclusive sales representative agreement

20  between Mukai and my company.

21  Q.  Generally under the terms of this agreement -- and I don't

22  want to go into all detail -- under the terms of this

23  agreement, what would Mr. Mukai be doing for you and how would

24  he be compensated?

25  A.  Mukai worked for me as an independent sales

1  representative, not an employee, just as a representative that
2  got paid on commission basis only.  So what he sold, he got
3  paid on, and it was agreed on a 6 percent commission.  And for
4  that, I made him the one and only sales representative for the
5  company.
6  **Q.**  Now, if you would turn to the last page of this agreement,
7  I want to ask you, what were the circumstances under which
8  this document was executed?
9  **A.**  You mean under "counsel review" here.
10  **Q.**  Yes, down below that it says Company, and there's a
11  signature line for A.G. Design and a signature line for
12  Mr. Mukai, do you see that?
13  **A.**  Yes.
14  **Q.**  Tell the court how this document came about to be signed
15  by the two of you?
16  **A.**  Well, you know, you can't have somebody representing your
17  company and not have an agreement, because you have to set
18  guidelines.  You are liable for what they tell customers or
19  whatever.  So I had my attorney draw up this agreement.  I
20  presented it to Mukai.  He read it and signed it.
21  **Q.**  Did he sign it in your presence?
22  **A.**  Yes, he did.
23       MR. CHRISTIE:  Your Honor, I have with me, and I will
24  show it to counsel, I don't want to have it marked and
25  admitted because it is the original Exhibit containing

1  original signatures, I would like not to lose total control of

2  it.  I have given a copy, but I would like to hand that up to

3  the court.

4       I can have my client authenticate it before I have it

5  passed to you.

6            THE COURT:  Is there an issue with that?

7            MR. CHRISTIE:  It is an issue, Mr. Mukai has called

8  --

9            THE COURT:  In terms of it being presented in this

10 fashion, any issue with that?

11           MR. COULTER:  No, Your Honor.

12           THE COURT:  All right.

13 BY MR. CHRISTIE:

14 Q.  Mr. Herrington, I have handed you what we have not marked,

15 but what I have indicated to the court is the original of

16 Exhibit 9, the non-exclusive sales representation agreement.

17      Can you look at that and tell me whether that's the

18 original bearing original signatures?

19 A.  It is.

20 Q.  On the back page of that, are those the original

21 signatures by you and by Mr. Mukai?

22 A.  Yes, that's correct.

23 Q.  Did he sign that in your presence?

24 A.  Yes, he did.

25 Q.  Under the terms of this agreement, what information did

1  you give up to Mr. Mukai to assist him in marketing your

2  lantern?

3  **A.**  Well, naturally he has all the customer lists, pricing,

4  what our costs are, our manufacturing.  Everything there is to

5  know about the company, because they have to know.  And also

6  he had to be completely trained on the lantern, why it was

7  invented, how it was invented, who it was invented for.

8      I took Mukai with me on several business trips.  I took

9  him to several trade shows.  Worked hand in hand with him.  So

10  he had full insight to everything about the company.

11  **Q.**  You spent some time here today telling the court about the

12  process that you went through in developing the patented

13  device.  Is there anything about the process, about the steps,

14  about who you talked to, who you were dealing with, who was

15  making the lantern that you did not share with Mr. Mukai?

16  **A.**  No.

17          MR. CHRISTIE:  Your Honor, I would move the admission

18  of Exhibit 9.

19          THE COURT:  Any objection?

20          MR. COULTER:  No.

21          THE COURT:  Do you want to substitute this exhibit in

22  the exhibit book for this one?

23          MR. CHRISTIE:  I think that would be appropriate, and

24  then we will know the original is the exhibit with the court

25  and left with the court.

1          (Plaintiff's Exhibit No. 9 received in evidence.)

2               THE COURT:   Now, you said everything about it but the

3    date of signature on there.

4    BY MR. CHRISTIE:

5    Q.   The date of signature, what date was it signed on?  It

6    says April 1 on the cover page?

7    A.   April 1, 2003.

8    Q.   Is that the date you met with Mr. Mukai?

9    A.   I believe so.

10   Q.   Where did you meet with him?

11   A.   At the Doubletree Inn in Bellevue.

12   Q.   Was it Doubletree at the time you met?

13   A.   It used to be the Red Lion Inn, and then they changed the

14   name.   I am not sure when that name was changed, but it was a

15   good meeting spot because Mukai lives in Tacoma.   I live on

16   Whidbey Island.   And I didn't want to hinder him from driving

17   all the way to Whidbey Island every time we had to have a

18   meeting, so I tried to meet him halfway and buy him lunch and

19   have the meeting at the same time.

20   Q.   While we are on that document, if you could please turn to

21   page 3 of that -- excuse me, page 4 of it, the end of

22   paragraph 6 on the term.   Here's a paragraph that says "upon

23   termination".   Do you see that?

24   A.   Yes.

25   Q.   Has this agreement been terminated by you?

1    A.  Yes, it has.

2    Q.  When was it terminated, if you know?

3    A.  I don't recollect, no.

4    Q.  I will come back to that in a minute.

5        There is a noncompete provision in here.  Specifically,

6    there's a noncompete provision following termination that is

7    set forth on what is submarked page 7.  The individual pages

8    of this aren't marked.

9        Do you see the covenant not to compete on the bottom of

10   the page, paragraph 8, continuing on to the next page?

11   A.  Yes, it is.

12   Q.  It runs from three years from termination; is that

13   correct?

14   A.  Yes.

15        MR. CHRISTIE:  Your Honor, to refresh his

16   recollection as to when the last payment was made to

17   Mr. Mukai, may I approach and present him with something that

18   may refresh his recollection?

19        THE COURT:  Have him look at it.

20        MR. CHRISTIE:  And I will give a copy of that to

21   counsel.

22   BY MR. CHRISTIE:

23   Q.  What are you looking at there, sir?

24   A.  It's either a refund check or a commission check.  It

25   looks like on the bottom here, it's a commission check.

1  **Q.**  What's the date on that check?

2  **A.**  June 15, 2004.

3  **Q.**  I will represent to you I have a series of checks, and

4  that is the last check that I was provided that Linda your

5  wife provided to me.  Does that refresh your recollection

6  about the general timeframe when your non-exclusive sales

7  arrangement with Mr. Mukai came to an end?

8  **A.**  I would say somewhere in that neighborhood, because we

9  were going through the, also the marketing or the selling of

10 the business when Mukai and his brother came to me to purchase

11 the business.  And when I terminated the letter of intent on

12 them, it was right after when we went our separate ways.

13 **Q.**  So sometime in the summer or so of 2004?

14 **A.**  I am going to say it was closer to July or somewhere in

15 there.

16 **Q.**  Okay.  So the noncompete agreement under this would run

17 from three years from that date?

18 **A.**  Yes.

19 **Q.**  Now, there's a provision this here, and I ask this because

20 of some of the materials that Mr. Mukai presented to the court

21 in his declaration.  There's a provision in here, if I can

22 direct you to paragraph 2.4, on the second page, where

23 Mr. Mukai was to provide you with monthly sales reports,

24 written monthly reports.  Have you seen any of those in the

25 materials that Mr. Mukai has presented to this court?

1  **A.**  No.

2  **Q.**  There's also a provision at the top of that page that A.G.

3  Design has to approve any pricing books, bulletins, other

4  releases.  Have you seen examples of supposed pricing lists

5  that Mr. Mukai presented to the court in this case?

6  **A.**  I seen them in his declaration.  That's the first time I

7  have ever seen them.

8  **Q.**  Were they ever approved by you or by A.G. Design?

9  **A.**  No, they were not.

10  **Q.**  Were any of the bulletins that he presented, and there was

11  some correspondence that he issued, was any of that authorized

12  by you?

13  **A.**  It looks to me as if he's taken some of the bulletins, the

14  original bulletins and then back-dated them and added copy to

15  it.

16  **Q.**  Okay.  Let me then ask you, you make mention as well --

17  excuse me, if we look at the fourth page of this agreement it

18  says that upon termination, Mr. Mukai shall promptly deliver

19  and return to you company property.  Did Mr. Mukai ever return

20  to you the lantern that he presented to this court?

21  **A.**  No, he did not.  He had several lanterns.

22  **Q.**  Now, can I direct the court and the witness please to

23  Exhibit 14.

24      You mention at the time same timeframe which this sales

25  agreement, excuse me, this representation agreement Exhibit 9

1  was in effect, there was an offer made by Mr. Mukai and his

2  brother Scott Mukai to purchase your company.

3       Can you tell the court what Exhibit 14 is?

4  **A.**  Well it's a letter of intent to purchase the business

5  known as A.G. Design & Associates, Inc. and its assets.

6  **Q.**  There are signatures on that document on the second page.

7  Do you see that?

8  **A.**  Yes.

9       MR. CHRISTIE:  I am going to show to counsel and

10 present to the court the original of that document and would

11 ask that it be substituted.  If there's no objection, I will

12 make any necessary foundation that is necessary.

13 BY MR. CHRISTIE:

14 **Q.**  Can you identify the document I have now presented to you,

15 is that the original that's been marked as Exhibit 14?

16 **A.**  Yes, it is.

17 **Q.**  Containing original signatures?

18 **A.**  Yes.

19      MR. CHRISTIE:  Your Honor, I would move to admit

20 Exhibit 14 and ask the original be substituted for the court

21 record.

22      THE COURT:  All right.  Any objection on that?

23      MR. COULTER:  No objection.

24      THE COURT:  Admitted.

25      (Plaintiff's Exhibit No. 14 received in evidence.)

BY MR. CHRISTIE:

**Q.** I will direct you next to -- let me ask you this, in conjunction with this letter of intent which talks about the disclosure of confidential financial and proprietary information, what did you provide Mr. Mukai and his brother access to in conjunction with this purported attempt to purchase your company?

**A.** Naturally they had to have access to all our financial records, our books and everything, so they could -- they were trying to secure funding to purchase the company. So they had to provide that to their banks and so on.

**Q.** Did that include access to your cost per unit for production?

**A.** Absolutely.

**Q.** Did it include access to all information concerning your market for your product?

**A.** Right, because he had to do his business plan and market research, know what my customers were, what our costs of manufacturing was.

They had to know everything about the company.

**Q.** Did it ever come to fruition that this agreement was followed through?

**A.** It never went through, no.

**Q.** Did you have an occasion to meet with Mr. Mukai and have a discussion with him about his effort to secure financing from

1    a banker?

2    **A.**  Several times.  I even met with his banker a couple times.

3    **Q.**  Was there a request made by Mr. Mukai to you in

4    conjunction with that effort?

5    **A.**  Well, in one area there that I felt very uncomfortable

6    with, he asked me to relay to the banker that we had like a

7    million dollars of inventory in Shelbyville, Illinois, so he

8    could use that as collateral to get a million dollars from the

9    bank.

10       I told him I would not do that and I would not -- that's

11   committing fraud.  I also put that in writing to him that I

12   would not do that.

13   **Q.**  Eventually did the time period of this, after some

14   extensions, expire?

15   **A.**  Actually we were very lenient, because the first agreement

16   of the letter of intent was for six months.  I asked him, when

17   we signed the letter of intent, I said we're both going to

18   incur attorney fees here, okay, so I asked him for a $7500

19   deposit on the letter of intent when we signed the letter of

20   intent.  With the agreement that if the deal didn't go through

21   or if he canceled the deal or whatever, if he canceled it I

22   would refund his money less my attorney fees.  If I canceled

23   it I would refund all of his money.  And that was written up

24   in the letter of intent.

25       In six months time, after six months time he came to me

1   and said he had not been able to secure financing.  So I give

2   him another extension on top of that.  I think two more

3   extensions.

4       Then finally I found out that his last ditch effort was to

5   give me like a million dollars and pay payments out of the

6   accounts receivable.  I told him, why would I want to pay for

7   payments out of my money.

8   **Q.**  Let me direct you if I could, please, to Exhibit 16.  Can

9   you identify what this is for the court?

10  **A.**  It's an email from Marcus to me.

11  **Q.**  Look at the bottom portion which appears to be the first

12  email in the exchange.

13  **A.**  Okay, that's an email from my wife Linda to Marcus, and

14  the subject is "Relationship status."

15  **Q.**  Was the function and purpose, at least of this email, to

16  document a termination of your relationship both as it related

17  to the sales representation position, as well as any effort to

18  purchase your company?

19  **A.**  Yes.

20          MR. CHRISTIE:  Your Honor, I would move the admission

21  of Exhibit 16.  I move the admission of 16.

22          THE COURT:  I understand.  I didn't hear from

23  counsel.

24          MR. COULTER:  Are you admitting my 16?

25          MR. CHRISTIE:  My 16.

1              THE COURT:  It seems like an email between the
2  parties, isn't it?  Did you come to a position on that?
3              MR. COULTER:  Yes, we have no objection.
4              THE COURT:  All right, admitted.
5      (Plaintiff's Exhibit No. 16 received in evidence.)
6  BY MR. CHRISTIE:
7  Q.  Mr. Herrington, you filed application for patent of the
8  final device in May of 2004, correct?
9  A.  That's correct.
10  Q.  May 11, 2004.  Let me direct you to Exhibit 18 in the
11  book, please.
12      Is this a copy of the actual United States Patent issued
13  to you?
14  A.  Yes, it is.
15              MR. CHRISTIE:  I would move the admission of 18.
16              THE COURT:  Mr. Coulter, when they are offered, I
17  would appreciate it if you would respond to whether you have
18  some problem with it.
19              MR. COULTER:  I apologize.  I have no objection, Your
20  honor.
21              THE COURT:  Admitted.
22      (Plaintiff's Exhibit No. 18 received in evidence.)
23  BY MR. CHRISTIE:
24  Q.  This patent shows an issued date of October 10, 2006,
25  correct?

1    **A.**  Yes.

2    **Q.**  It's issued to you.  Have you since assigned this patent

3    to A.G. Design, the plaintiff in this lawsuit?

4    **A.**  Yes.

5    **Q.**  So all rights with that patent now lay with your company

6    A.G. Design & Associates, LLC?

7    **A.**  That's correct.

8    **Q.**  Now, there's a lot of language contained in the patent,

9    drafting language.  Did you have counsel represent you in that

10   process?

11   **A.**  Yes, I did.

12   **Q.**  Did that counsel interact as best you know -- and I don't

13   want you to review the contents of your discussions with your

14   lawyer -- but did your counsel have interactions with the

15   patent examiner?

16   **A.**  Yes.

17   **Q.**  In terms of the details of how this patent was framed

18   originally or how it may have been modified during the course

19   of that process, did you leave that to counsel?

20   **A.**  Yes, I did.

21           MR. CHRISTIE:  I just want to make sure on the

22   record, is 18 admitted?

23           THE COURT:  It's been admitted.

24           MR. CHRISTIE:  Thank you.

25   BY MR. CHRISTIE:

1  Q.  The patent contains language -- I am not going to spend a
2  lot of time on this given who was involved with the
3  drafting -- but the patent contains language, if you'll turn
4  to the page containing the claims, and there's no individual
5  page numbers, but on the top the columns are numbered 9 and
6  10?
7      Do you have that in front of you?
8  A.  I didn't understand, 9 and 10?
9  Q.  The columns at top are labeled 9 and 10, but the column at
10 left begins partway down and says "What is claimed."
11     Do you see that?
12 A.  Yes.
13 Q.  There's reference in this section about what is claimed,
14 "a plurality of ports," do you see that language?
15 A.  Yes.
16 Q.  And specifically there's the use of the word "augment",
17 that the plurality of the ports augment the lateral light.
18 What is your lay understanding, given that you invented this
19 device, what is your understanding of this word "augment"?
20 A.  To increase.
21 Q.  In terms of the function of creating lateral light, what
22 does that in your device?
23 A.  Well, to create the lateral light is naturally the LED
24 shining into the back of the reflector, because I've had the
25 reflector vacuum metallized on the back side as well as on the

1  inside.  And then I added the ports to where it would pick up

2  the light from the filament of the center bulb without adding

3  more LEDs.

4  **Q.**  And the addition of LEDs, I take it, was a conscious

5  decision recognizing that there was a tradeoff in terms of

6  power drain on this?

7  **A.**  That's correct, if you keep adding LEDs, you keep putting

8  more strain on the battery so then you use more batteries.

9  And that's what the railroads want to stay away from is using

10  more batteries.  So they want to create light without draining

11  the batteries down.

12  **Q.**  Is there any way from your perspective to create the level

13  of lateral light needed, according to all the design input

14  that you received, to create that lateral light without the

15  LEDs and simply by using holes or ports in your reflector?

16  **A.**  I don't understand the question.

17  **Q.**  Was there any way in your design process that you felt you

18  would have created an adequate amount of lateral light simply

19  by putting holes in your reflector and not having LEDs?

20  **A.**  No, you have to have the LEDs.

21         THE COURT:  Let's see if we can take this up --

22         MR. CHRISTIE:  That was going to conclude my

23  examination.  I will follow-up with any rebuttal, So this

24  would be an appropriate time to --

25         THE COURT:  All right.  Then let's take the morning

1    recess, and then you can begin your cross-examination.

2        All right.  We will be at recess.

3            THE CLERK:  All rise, court is in recess.

4            MR. CHRISTIE:  Your Honor, I misspoke, there was a

5    couple other matters that I just wanted to try and do.  I will

6    try and be as time efficient as possible with them.

7            THE COURT:  All right, go ahead.

8            MR. CHRISTIE:  There are a series of exhibits that

9    relate to the timing for the ordering of the final reflector

10   that contains the port windows culminating in an order placed

11   in the middle part of 2003 that bear on this first sale issue.

12       I have asked Mr. Coulter -- and what I would like to do is

13   identify those by number, and I will move their admission,

14   hopefully not take a lot of time on them today.

15       They are discussed in detail in Mr. Herrington's

16   supplemental declaration, and frankly they were all

17   attachments to that.  If that's acceptable, maybe I can just

18   move through it in that fashion?

19           THE COURT:  All right.

20           MR. CHRISTIE:  Those would be Exhibits 3, 4, 5, 6, 7,

21   8, 10, 11, 12, 13; and I think those are all the ones that

22   relate to that issue of ordering those.  So I would move the

23   admission of those.

24           THE COURT:  Mr. Coulter, have you had some discussion

25   on this?

1              MR. COULTER:  We have no objection, Your honor.

2        (Plaintiff's Exhibit Nos. 3, 4, 5, 6, 7, 8, 10, 11, 12,

3   and 13 received in evidence.)

4              THE COURT:  All right.

5              MR. CHRISTIE:  For the record, Your Honor, I think it

6   would be appropriate for me to move the admission of the

7   exemplar of the patented device and the accused device, the

8   two that I handed up to you which don't have stickers on them,

9   but we would need to put stickers on them.

10             THE COURT:  All right.

11             MR. CHRISTIE:  And then the other exhibits I

12  submitted that I will identify by number and move their

13  admission without going into the detail of them.  They relate

14  to some exchanges between Mr. Mukai and Mr. Herrington as late

15  as 2006 when Mr. Mukai is seeking to purchase the newest model

16  of Mr. Herrington's light that contains LED technology.

17       There's also some advertisements that are from the

18  American Lantern Company, the defense company that promote the

19  features of that lantern.  Those would be Exhibits 15, 17, 19,

20  20, 21, 22, and 23.  So I would move the admission of those.

21             THE COURT:  All right.  Go ahead.

22             MR. CHRISTIE:  I thought I'd wait to see if there

23  was any objection.

24             MR. COULTER:  No objection.

25        (Plaintiff's Exhibit Nos. 15, 17, 19, 20, 21, 22, and.

1       23 received in evidence.)

2           MR. CHRISTIE:   I think all my exhibits have been

3   moved and admitted.

4           THE COURT:   They are admitted.

5   BY MR. CHRISTIE:

6   **Q.**  Let me take the balance of my time, Mr. Herrington, could

7   you tell the court about the impact that Mr. Mukai's device in

8   the marketplace has had on your business, and perhaps you

9   could spend just a minute or so explaining how the railroad

10  industry purchases commodities like this so he'll understand

11  that background.

12  **A.**  Each railroad, they are so big they have several

13  procurement officers.   And these procurement officers, they

14  are assigned commodities.   Like you'll have one procurement

15  officer, his commodity will be, like, batteries,

16  lanterns/lights, stuff in the lighting aspects of things.   His

17  duty would be to purchase the best lantern for the best price

18  budget wise for his railroad.

19      In stock code that is the railroad, which Mukai was very

20  familiar with that because I taught him all this when he went

21  to work for A.G. Design and took him around and introduced him

22  to all these different procurement officers and so on.

23      Recently, there's nine class I railroads in the United

24  States and Canada.   What I mean by class I railroads, they are

25  railroads that do business in the excess of a billion dollars

1  each.  They are very large railroads, and they all use

2  trainman lanterns, and they all have this one procurement

3  officer that procures for that product line on trainman

4  lanterns.

5  Q.  Can you give the Judge a sense, in terms of millions if

6  you can, what the value of business of selling railroad

7  lanterns to this centralized procurement for those class I

8  railroads would be?

9  A.  On the average, depending on the size of the railroad,

10  like take the largest class I, which is Union Pacific

11  Railroad, they would purchase close to a million dollars a

12  year in total revenue of lanterns from you.  Then Burlington

13  Northern being the second largest, it would be somewhere

14  around 6 - $700,000 a year in total revenue of business.

15      What's recently happened, and I think this is what spurred

16  Mukai to come up with his lantern, is all the class I

17  railroads got together and all their procurement people got

18  together and said okay, let's do this, let's develop a company

19  and we will call it Rail Marketplace.  What we will do in Rail

20  Marketplace is we will take a commodity, whether it's a

21  battery or a flashlight or whatever it is, and we will take

22  this commodity, we will go to the vendors that make this

23  commodity, we will say here's what we are going to do, if you

24  can give us the best volume break, best volume price and the

25  best lantern, we will standardize your lantern into all the

1    class Is, not just one or two, we'll all go with it.  That's a
2    vendor's dream come true to have that happen because all of a
3    sudden you pick up all the class Is.  Once all the class Is
4    are using your product then naturally all the other railroads,
5    the class IIs and regional and short liners follows suit
6    because that's what the class Is are using.

7        So pretty soon you become the only lantern or battery
8    manufacture for the railroad industry.

9    Q.  What, from your experience, has happened, in the context
10   that you have in the procurement offices of these class I
11   railroads, with the introduction of Mr. Mukai's lantern into
12   that marketplace?

13   A.  I've got on an airplane and visited with these purchasing
14   people with Rail Marketplace and talked to them.  And at one
15   time my lantern was accepted into Norfolk Southern, this is
16   the route they were going to go, they made up their minds to
17   go with that.  And then all of a sudden our communication
18   broke down.  We couldn't get answers to emails, answers to
19   phone calls.

20       So I finally kept digging for the answer, and then I found
21   out that American Trainman Lantern Company had approached them
22   and guaranteed them a lifetime guarantee lantern, where if
23   anything ever went wrong with it, they would have it replaced
24   at no charge and also guaranteeing a lesser price lantern.

25       So everything came to a halt where they would start

1  testing the American Trainman Lantern.  I also found that out

2  in Union Pacific and I also found that out in CSX.

3  **Q.**  The American Trainman Lantern, just so it's clear to the

4  court, that's Mr. Mukai's lantern?

5  **A.**  Yes.

6  **Q.**  Now, from your perspective are the individuals that are

7  making decisions about procurement, are those individuals that

8  Mr. Mukai has met through the relationships that he had with

9  your company?

10  **A.**  I am not sure, because they change quite often.  They move

11  up or move out in different jobs.  Sometimes you have a

12  procurement officer that's there a long time, and some that

13  are only there for a couple years.  So I don't know that for a

14  sure thing.

15  **Q.**  From the things you were hearing from your contacts in the

16  marketplace, is Mr. Mukai actively and has he been actively

17  competing with his product against you?

18  **A.**  Yes, most definitely.

19  **Q.**  Now, from a damage standpoint, is monetary relief -- if

20  the court were to eventually award strictly monetary relief

21  damages, money damages -- would that be adequate to compensate

22  you for what you perceive to have been the injury to your

23  business?

24  **A.**  No.  Because we are -- this is long-term.  This is -- we

25  are talking, once your stock goes into a class I railroad,

1   they will not unstock code you unless you've done something
2   terribly wrong or raised your price or something, because they
3   don't want to keep stocking products over and over and over
4   again.  They want to settle on a product, get it stock coded
5   in, buy that product.  And that's why I have been with BNSF
6   for 10 years, because they have stock coded my product into
7   their system.
8       What Mukai has done, he's halted all my other marketing by
9   going to these companies.  One small example, I flew up to
10  Montreal and met with the purchasing guy in Montreal for
11  Canadian National, which is a class I.  We were walking down
12  the hallway to his office, and he stopped me and said:  I can
13  tell you right now we will never use your lantern.  I says:
14  Why is that, is it a better lantern, less money?  And he said:
15  Because of what Marcus has told me.
16          MR. COULTER:  Objection, this is all hearsay
17  evidence.
18          THE COURT:  I agree.
19          MR. CHRISTIE:  Your Honor, I guess I would say it's
20  not being offered for the truth of the matter.  It's being
21  offered to assist this witness in explaining at least from
22  what he knows at this early stage of preliminary injunction
23  about the impact that this competing lantern is having in the
24  marketplace.
25          THE COURT:  I understand, but I think I have heard

1   enough.

2         MR. CHRISTIE:  Thank you, Your Honor.  That's all I

3   have.  Thank you, sir.

4         Mr. Coulter, any questions?

5         MR. COULTER:  Yes, Your Honor.

6                      CROSS-EXAMINATION

7   BY MR. COULTER:

8   Q.  Good morning, Mr. Herrington.

9   A.  Good morning.

10  Q.  Just previously you were discussing the procurement

11  officers at the different rails that you were talking to.

12  Could you give me the names of those people and what rails

13  they are in?

14  A.  One at NS would be Jim Mathews, and Donald -- I can't

15  remember his last name -- a procurement officer that started

16  out with Rail Marketplace, but he was moved into a diesel

17  section and another fellow took his place.  I think it was Don

18  Anderson, I am not exactly -- I don't have my notes in front

19  of me on that.  But Jim Mathews is the fellow that heads up

20  the end of the procurement for NS.  And then there was a

21  fellow at CSX, again, the problem there, he's moved on to a

22  different position.

23  Q.  So he's not currently at CSX now?

24  A.  The last word -- my son-in-law handles the sales for my

25  company now, and he's been the one relating with the

1  procurement officer at CSX.  The last word that we got is that
2  he moved up and they were moving another fellow in to take his
3  place.
4  **Q.**  What about any of the other railroads?
5  **A.**  CN was Nick Lesey.  NSF was Lawrence Fleischer.
6  **Q.**  I am sorry, that was Lawrence --
7  **A.**  Fleischer.
8  **Q.**  Were there any other purchasing or procurement officers
9  that you talked to?
10 **A.**  Not -- no, not that I have talked to.
11 **Q.**  So you just testified that you had experienced a drop in
12 interest for your product from the railroads; is that correct?
13 **A.**  I didn't understand the question.
14 **Q.**  You were just testifying that at some point communication
15 broke down and the rails lost interest in your product, or you
16 weren't getting emails returned; is that correct?
17 **A.**  Yes.
18 **Q.**  Which product was that?
19 **A.**  Our trainman line.
20 **Q.**  The patented device?
21 **A.**  Yes.
22 **Q.**  Are there trials being conducted now by the Rail
23 Marketplace?
24 **A.**  There has been.  And the last result we got, except for
25 NSF -- NS tried us in Roanoke, Virginia.  We were given thumbs

1   up in Roanoke, Virginia, and then they came back and they

2   purchased several more lanterns to put in five other locations

3   for further testing in those five locations.  So I know the

4   testing is going on there.

5      Union Pacific tested in six different locations.

6      Canadian Pacific is testing our lantern.  As a matter of

7   fact, they are purchasing our lantern.

8      BNSF did not have to test our lantern, because they were

9   already buying it.

10      There's several railroads that are testing our lantern.

11 **Q.**  Are there any railroads that have declined to continue

12   testing your product?

13 **A.**  Have declined testing it?

14 **Q.**  Have quit testing, decided they are not interested in your

15   product?

16 **A.**  Last I heard Union Pacific was done testing it, and they

17   had -- their safety people had passed it upstairs to

18   procurement.  Their comments was wherever it goes from there.

19   But they were also testing the American Trainman Lantern, and

20   that was a fellow by the name of George Day.

21      BNSF refused to test the American Trainman Lantern because

22   as soon as it hit their desk they said it was an exact copy

23   and they had no interest in it.

24      CN, I'm not sure exactly where they are testing it.  They

25   are more interested in our LED model than our incandescent

1   model.

2       CSX is testing the lantern.  I don't know the results of

3   that because our communication --

4   Q.  You haven't been notified at this point that someone has

5   decided to cease testing on it and they weren't moving forward

6   with it.  Have you received notification that someone wasn't

7   moving forward with your product after testing?

8   A.  At one time NS approached us and said that they were

9   assigning a stock code to it, and they were very happy with

10  the testing.  And then all of a sudden the communications

11  started to break down, and then I found out from Rail

12  Marketplace that was because of American Trainman Lantern.

13  They were now testing their lantern.

14  Q.  They are now testing what?

15  A.  American Trainman lantern.

16  Q.  So out of the nine class I railroads, one of them may have

17  been affected by the Trainman Lantern product?

18  A.  I have no idea.  How many has been affected?  I am sure

19  they have all been affected in some sort or another.

20  Q.  I want to just briefly come back to the letter of intent

21  that you and Mr. Mukai signed?

22  A.  Sure.

23          THE COURT:  What is the exhibit number, counsel?

24          MR. CHRISTIE:  It's 9, Your Honor.

25  BY MR. COULTER:

1  **Q.** Now, you indicated that you weren't able to reach terms of

2  a purchase. Do you see this section 3 here, could you read

3  the section 3 out loud on the page?

4  **A.** This is in the letter of intent?

5  **Q.** Yes.

6  **A.** Section 3.

7  **Q.** Yes.

8      MR. CHRISTIE: Your Honor, mistakenly said 9, which

9  is the non-exclusive sales agreement. The letter of intent is

10  14. I apologize to the court.

11  **A.** No. 3 says, "If, for any reason, Mukai cancels the

12  discussions to purchase A.G. before the expiration of 180 days

13  from the date of acceptance by all parties of this letter of

14  intent, any and all attorney's fees incurred by A.G. in

15  connection with the asset purchase agreement shall be deducted

16  from the good faith deposit held by A.G. with the balance

17  being returned to Mukai."

18  BY MR. COULTER:

19  **Q.** Did Mr. Mukai terminate this letter of intent, or did you?

20  **A.** Well, when he reached 180 days and he had no money to buy

21  the company, had no financing, and then asked for an

22  extension, I gave him an extension. And then after that

23  extension he asked for another extension. Then it finally

24  came to a mutual agreement that the agreement was over with.

25  And I deducted my attorney fees, I actually lost money on it.

 1  I paid a lot more than $7500 in attorney fees.

 2  Q.  So did you notify him that you were terminating the letter

 3  of intent?

 4  A.  I believe so.  I don't remember if it was verbally or in

 5  writing or by email.  It's been so long ago.

 6  Q.  Mr. Herrington, do you remember sending a letter on March

 7  1, 2004 to Mr. Mukai?

 8          THE COURT:  Is this an exhibit somewhere?  Is there a

 9  number?

10          MR. COULTER:  13.

11          THE COURT:  Your 13 or --

12          MR. COULTER:  My 13.

13  BY MR. COULTER:

14  Q.  Could you turn to the second page of this letter?

15  A.  I don't have a second page.

16  Q.  You don't have a second page?

17          MR. COULTER:  Your Honor, may I approach the witness?

18          THE COURT:  Put it on there.  He can see that.

19  BY MR. COULTER:

20  Q.  Can you see that, Mr. Herrington?

21  A.  Yes.

22  Q.  So, is it fair to say that this letter terminated, your

23  letter of intent terminated Mr. Mukai's offer to purchase?

24  A.  That's correct.

25          MR. COULTER:  Your Honor, I move to admit Exhibit 13.

1            MR. CHRISTIE:  No objection.

2            THE COURT:  Admitted.

3       (Defendants' Exhibit No. A-13 received in evidence.)

4   BY MR. COULTER:

5   Q.  And so now returning to Exhibit 14, page 2.

6   A.  That's the letter of intent?

7            THE COURT:  What Exhibit this now?

8            MR. COULTER:  14.

9            THE COURT:  Your 14?

10           MR. COULTER:  His 14, Plaintiff's Exhibit No. 14.

11  BY MR. COULTER:

12  Q.  Mr. Herrington, could you read No. 4 on page 2?

13  A.  "If, for any reason, A.G. cancels the discussions to sell

14  A.G. to Mukai before the expiration of the 180 days from the

15  date of acceptance by all parties of this letter of intent,

16  any and all attorney's fees incurred by Mukai in connection

17  with the asset purchase agreement shall be paid by A.G. and

18  the good faith deposit shall be returned to Mukai in full."

19  Q.  Did you return the deposit to Mr. Mukai?

20  A.  No, I didn't.

21           MR. CHRISTIE:  I am going to object to this line of

22  questioning on the grounds of relevancy for this proceeding.

23           THE COURT:  What is this?

24           MR. COULTER:  We are only addressing it because they

25  brought it out in their direct examination.

1          THE COURT:  I understand, but where is it going to
2     help me?  We are talking about an injunction and the question
3     is raised also about the noncompetition.
4          Aside from that, maybe you ought to focus on those issues.
5     I am going to try this case, and I am going to figure all that
6     out.  Today I just want to find out whether an injunction
7     should issue, and those would be things that would go to that,
8     right.
9          MR. COULTER:  Yes.  I have one more question about
10    this exhibit, and then I will move on.
11    BY MR. COULTER:
12    **Q.** Which is simply, why didn't you refund the money to
13    Mr. Mukai?
14    **A.** Because it's agreed that after the 180 days if they didn't
15    have the money, whatever attorney fees I incurred would be
16    deducted from those funds.
17    **Q.** Did you agree to give him an extension?
18    **A.** Pardon?
19    **Q.** You gave him an extension on the 180 days?
20    **A.** I sure did.
21         MR. COULTER:  No further questions.
22         THE COURT:  All right.  Are we through with this
23    witness at this time, then?
24         MR. COULTER:  I am sorry, on that particular issue.
25    I would like to move on to the injunction issue.

1  BY MR. COULTER:

2  **Q.** I would like to look at Plaintiff's Exhibit No. 18, the

3  patent, is that correct, 18? If we could just return to

4  column 9 and 10 that we were looking at earlier.

5  **A.** Okay.

6  **Q.** When we discussed this earlier, you made a comment that

7  there was no difference between the prototype and the final

8  product.

9  **A.** I don't remember saying that.

10 **Q.** Then I am misremembering.

11     You did make a statement that you look at what every other

12 manufacture is making in terms of determining how you are

13 going to proceed with your product?

14 **A.** I said most vendors will look at what's out there in the

15 marketplace, what's available and how it works and why it

16 works. That's how you invent things. If you see something

17 that doesn't work you know there's a better way to do it.

18 **Q.** Was one of the prior products that you looked at the Star

19 Lantern?

20 **A.** I looked at several lanterns. I looked at the Star

21 Lantern, the McDermott lantern. I looked at the Conjure

22 Lantern. I looked at every lantern available. I looked at

23 all the Ranger lighting, Lumilite Lighting.

24     I could go on and on about lighting I've looked at. I

25 have got catalogs and catalogs of lighting and suppliers that

1  supply different components.  I have bought literally
2  thousands of dollars worth of components from different
3  manufacturers.
4  **Q.**  If we could just take a quick look at the front page of
5  the patent application, under left-hand column, all the way
6  down towards the bottom where it says "Other Publications",
7  this Star Model 292.
8  **A.**  Yes.
9  **Q.**  So the Star Lantern was cited as prior art when you were
10  looking at granting the patent?
11  **A.**  That's correct.  There was a lot of prior art cited, not
12  just Star.  There was even prior art that related to a tea
13  kettle.
14  **Q.**  I am going to put up here Defendants' Exhibit No. 22.
15        MR. CHRISTIE:  Your Honor, could I ask that the
16  document be identified and admitted before published.  I know
17  there's not a jury here.  I just note that for the record.
18        THE COURT:  They should be, and I am looking for it,
19  the document here in the material that you provided.  I see no
20  Exhibit 22, I don't believe.  Here it is.
21        MR. COULTER:  It's the last exhibit.
22        THE COURT:  Let's do it in a way -- I know there's no
23  jury here and all of that, but you don't really publish them
24  so everybody can see them until the court has told you it's
25  okay to do that.

1      So why don't you have -- well, I believe Mr. Herrington

2  has 22.  Why don't you go ahead and ask your questions about

3  it and let's get into a little bit first.

4  BY MR. COULTER:

5  **Q.**  Mr. Herrington, can you take a look at Exhibit 22?

6  **A.**  Uh-huh.

7  **Q.**  Have you seen this ad before?

8  **A.**  No, I haven't.

9  **Q.**  Are you familiar with Star Headlight & Lantern Company?

10  **A.**  Yes, I am.

11  **Q.**  Does this product resemble yours?

12  **A.**  It -- yeah, in some ways, it does.

13  **Q.**  What ways does it not?

14  **A.**  Does it not?  It doesn't have the bumper ring around the

15  end here.  The lantern case is completely different.  The

16  lantern handle is completely different.  The way the handle is

17  hooked to the body is completely different.  The way the cage

18  is threaded on is completely different.

19      The only thing that's basically close to mine would be,

20  from looking at this picture, is the textured cage and the

21  incandescent or LED bulb in the center of the lantern.

22  **Q.**  So would it be safe to say this has a plurality of LEDs?

23  **A.**  That it does have?

24  **Q.**  That it does have?

25  **A.**  That's what it's claiming here in this paper work, yes.

1  Q.  Is there anything in here that's similar to your product?

2            MR. CHRISTIE:  Objection, asked and answered.

3            THE COURT:  What's the point, where are we headed

4  with this?

5            MR. COULTER:  Your Honor, I am trying to establish

6  Star Lantern has been cited as prior art.  Here is a product

7  by Star Lantern that, if this injunction issues, it will also

8  be applied against Star Lantern.  If Star Lantern is being

9  cited as prior art --

10           THE COURT:  I will hear about that at some point in

11 time, but that's not my concern here.  My concern right now is

12 between these two.

13 A.  The prior art is the 292 lantern, not this lantern.

14           MR. COULTER:  I will withdraw the exhibit.

15           THE COURT:  All right.  Let's move in a direction

16 that helps me here, what I have to do here.

17           MR. COULTER:  Yes, Your Honor.

18 BY MR. COULTER:

19 Q.  I am going to put Plaintiff's Exhibit No. 18 back up,

20 which is the patent and then I am going to go back to the

21 claims listed in columns 9 and 10.

22      Mr. Herrington, when you were discussing the similarities

23 between your product and my client's product --

24 A.  Uh-huh.

25 Q.  -- you cited a number of things and I would like to go

1    through them one by one.

2        You discussed the facet pattern of the two products, that

3    there was similarity.  Is it your understanding that the

4    faceting of the reflector is very similar in the two of them?

5    **A.**  When you say faceting, are you saying the texture?

6    **Q.**  I guess, yes, the texture.

7    **A.**  Yes.

8    **Q.**  The -- I am sorry, I do mean the reflector itself inside

9    the head assembly?

10   **A.**  Yes.

11   **Q.**  Was the pattern of the facet in the head assembly one of

12   your claims in the patent?

13   **A.**  I don't remember that without reading it.  It's been a

14   while.

15   **Q.**  Do you have the Star Lantern --

16   **A.**  Pardon?

17   **Q.**  Do you have the Star Lantern example in front of you?

18   **A.**  Yes, I do.

19   **Q.**  Could you open it up and take a look at the contact plate?

20   **A.**  (Complying.)  Yes.

21   **Q.**  How does that compare to the contact plate that you

22   discussed earlier that was similar between your product and my

23   client's product?

24   **A.**  Well, the only comparison actually is just the contact

25   plates, but this here has a brass plate and brass rivets on

1  the inside.  And that's kind of a planned obsolescence on

2  their part because after much time that turns green and

3  corrodes and the lantern quits working.

4      So instead of using stainless they use a brass center

5  contact.  They all have to have that or it won't work.

6  Q.  So, all trainman lanterns have to have this contact plate

7  to work?

8  A.  Yeah.

9  Q.  So the contact plate was a part of your patent?

10 A.  I don't believe so.

11 Q.  Was the textured cage that was discussed earlier, you

12 compared the similarity between the two products, is that part

13 of your patent?

14 A.  I believe it's mentioned in there, yes.

15 Q.  Is claim 2, the trainman's lantern of claim 1, further

16 comprising a substantially transparent housing mounted

17 generally?

18 A.  You are back to the patent here?

19 Q.  Yes.

20 A.  What am I reading here?

21 Q.  You are looking at column 9, and you are going down about

22 two-thirds of the way, claim 2.

23 A.  It mentions the textured cage, yeah.

24 Q.  Where are we discussing texture?  I see transparent

25 housing mounted.  Texture doesn't appear to be part of the

1  claim of this patent.

2  **A.**  Well, I guess that's the wording the attorney put in

3  there.  I didn't write the patent.

4  **Q.**  Sure, I understand.

5      Can you tell me about the pebbling surface that you

6  discussed that was the same between the two products?

7  **A.**  You mean on the case itself?

8  **Q.**  On the case itself.

9  **A.**  What I was addressing there is Mr. Christie was asking me

10  why it was like that.  I said it was done because of the heat

11  process.  When you injection mold, injection mold under high

12  heat and several thousands of pounds per square inch pressure,

13  to come out with a shiny surface like this, you have to use,

14  1, a special type of plastic; 2, a lower heat process; and 3,

15  the inside of the mold has to be brought to a high polish,

16  like chrome plating.

17      These lanterns, both of these lanterns it shows very

18  clearly that neither one of the molds were polished to bring

19  out a high luster.  It's not -- it's what happens when you use

20  that type of material.

21  **Q.**  The patented product and the accused product had that

22  pebbling?

23  **A.**  From the naked eye, yes.

24  **Q.**  Is pebbling a claim of your patent?

25  **A.**  I don't call it pebbling, I just call it the surface of

1  it.  I don't know.  I'd probably say not.

2  Q.  Why were you earlier discussing the pebbling as a

3  similarity between the two products?

4  A.  I guess my attorney was trying to show you a comparison of

5  how close Mr. Mukai has tried to come to my lantern, right

6  down to the same texture as my housing.

7  Q.  We also talked about the bumper around at the top of the

8  two devices.  Are these similar?

9  A.  The only difference is Mukai's used a different type of

10  material other than -- I use a Buna rubber with a 7 percent

11  stretch in it.  I am not sure what' he's using here.  It feels

12  more like a PVC material and then he's added some dog legs on

13  there to make it a little bit different from the looks of

14  mine.  But it's same size, everything else, and does

15  everything the same, protects the lens from bumping against

16  the side of the car, as mine does.

17      The only thing it doesn't do with these dog legs on there,

18  if this is set on the floor of a locomotive, it will dance all

19  over the floor because it doesn't have a good grip to it.

20  Q.  Was the bumper a claim of your patent?

21  A.  I don't know.

22  Q.  You discussed the bail of your device that was an

23  improvement over the Star Lantern --

24  A.  Absolutely --

25  Q.  -- because that's locked in?

1  **A.**  -- I spent many, many days on that.  There's no way that
2  that man invented that.
3  **Q.**  Is this bail, it can be held in any position, is that a
4  claim in your patent?
5  **A.**  It might be, I know it was well discussed with my
6  attorney.  As I said, I haven't read the patent for several
7  months.  I guess I should have done that before I came here.
8  If it is, I am sure you know where it's at in there.
9           MR. CHRISTIE:  Does Your Honor want assistance on
10  this?
11           THE COURT:  I think you can redirect.  If you want
12  him to look at something that's in the patent.
13           MR. CHRISTIE:  I might just direct him to the bottom
14  right hand part of that page he's looking at where there's a
15  mention of the bail mounted, just to facilitate --
16  **A.**  It says, "A bail mounted to said battery case for
17  selectively holding said lantern in a vertical or horizontal
18  orientation for alternately signaling a locomotive engineer."
19  **Q.**  So what would be a vertical or horizontal location?  Could
20  you show us how the lantern would be used in a vertical or
21  horizontal location?
22  **A.**  Well, horizontal (indicating) and vertical (indicating.)
23  **Q.**  So then the ability for the bail to be held in any kind of
24  location is not in this claim; is that correct?
25  **A.**  Not the way that this is written here.

1  **Q.**  Does Mr. Mukai's product contain ports of any kind?

2  **A.**  No.

3  **Q.**  Is it fair to say that out of all the things that we've

4  discussed, the ports are the only claim that actually appear

5  in your patent?

6       MR. CHRISTIE:  Object to the form.

7       MR. COULTER:  I will withdraw the question.

8  BY MR. COULTER:

9  **Q.**  Are you aware of any claims of your patent that are

10  infringed by Mr. Mukai's product?

11  **A.**  I think the whole thing infringes my patent, other than

12  the ports.

13  **Q.**  So it doesn't contain any --

14       MR. CHRISTIE:  Objection, asked and answered.

15       THE COURT:  I think I can see it here.

16       MR. COULTER:  I'll withdraw that.  No further

17  questions, Your Honor.

18       THE COURT:  All right.  Any other questions?

19       MR. CHRISTIE:  Very briefly, Your Honor.  If I could

20  have my client look at the same page of the patent you've been

21  looking at, 9 and 10.

22                    REDIRECT EXAMINATION

23  BY MR. CHRISTIE:

24  **Q.**  The reference to the language of the bail at the bottom

25  there, selectively holding the lantern, do you see that?

1  **A.**  Yes.

2  **Q.**  Would that allow that handle under this language to be

3  held in any position relative to horizontal or vertical as

4  you've designed it?

5  **A.**  Right, because you can select the position that you want.

6  **Q.**  Let me ask you this question.  In addition to those

7  features and functions that are patented specifically, what is

8  it about the virtual identity of these two products that has

9  affected your ability to market your product with Rail

10  Marketplace?

11  **A.**  Well, I think it's the -- as you can see, it's like Star

12  Lantern Company, they are trying to play catch up to copy my

13  lantern, or come out with something similar.  Mukai knew the

14  value of the real marketplace.  So again he knew, which Star

15  knew, Rail Marketplace was all leaning towards my lantern.

16  And they seen the opportunity to try to come forward with a

17  lantern that's similar to the A.G. lantern.

18       What I see here is everything is similar to my lantern;

19  function, looks.  If you made this one orange, people wouldn't

20  be able to tell the difference, other than the big handle on

21  here.  But I see now that he's changed to a smaller handle,

22  he's probably had complaints of the bigger handle.

23       But he's just undermining my market out there is what he's

24  doing.

25       I have no idea what pricing he's going into the

1   marketplace with.  He's had all the knowledge of my pricing,

2   so he knows what it costs me to make that lantern.  He knows

3   the margins that I have to have to survive at a break even

4   point in my company.

5       So he knows where to undermine me as far as pricing goes.

6   You can't go to the procurement people to ask them pricing

7   because they are not allowed by their company to discuss

8   pricing with other vendors or they will loose their job.

9       So I am sure that he's undercutting my price.

10      Like I said earlier, he's offering something that I think

11  is impossible to offer; a lifetime warranty on a lantern.  The

12  railroads are the roughest industry there is, and lanterns

13  don't last in the railroad industry.  Some last for 3 months,

14  six months.  That's about the extent of it.

15      I don't know how anybody could offer that.

16          MR. CHRISTIE:  That's all I have for this witness,

17  Your Honor.

18          THE COURT:  All right.

19      You may step down.

20          MR. CHRISTIE:  We call Dr. Jorgensen to the stand.

21          THE COURT:  Doctor, let me have you sworn.  If you

22  would raise your right hand, please.

23      JENS JORGENSEN, Ph.D., called as a witness, duly sworn.

24          THE COURT:  Just come around and take the witness

25  chair.

1                    DIRECT EXAMINATION

2  BY MR. CHRISTIE:

3  **Q.** Dr. Jorgensen, could you please give your full name and

4  your residence address for our court reporter?

5  **A.** The full name is Jens Erik, E-R-I-K, Jorgensen,

6  J-O-R-G-E-N-S-O-N.

7      The residence is 5015 44th Avenue Northeast, Seattle,

8  Washington, 98105.

9  **Q.** Thank you.

10     MR. CHRISTIE:  Your Honor, his report is found at

11  Plaintiff's Exhibit No. 23, which has been admitted.  Attached

12  to that report, or appended to it, is a copy of his CV which

13  contains a details discussion of his background.

14     In the interest of time, I am not going to go through all

15  that, but I would like him to describe his education and

16  professional background?

17        THE COURT:  All right.  Mr. Coulter -- it's your

18  witness too.  Do you have no issue with his CV?

19        MR. COULTER:  No, I don't.

20  BY MR. CHRISTIE:

21  **Q.** Go ahead.

22  **A.** My educational background, I finished high school in

23  Norway.  I attended a Community College there in engineering

24  for two years.

25     In 1957, I transferred to MIT, where I received any

1   bachelor's in '59.  To pay off my student loans, I had to go

2   to work for a couple years for a small hydraulics company in

3   southern California.

4      In '61, I returned to MIT and subsequently earned a

5   master's in mechanical engineering and a doctor of science,

6   which is equivalent to a Ph.D., in 1968.

7      Upon completion of my degree, I was hired at the

8   University of Washington as an assistant professor in the fall

9   of 1968.  And I remained there -- that was in the mechanical

10   engineering department, and I remained there until I retired

11   in 2001.

12   **Q.**  What has been your work since 2001?

13   **A.**  I have been doing some consulting and it's been partly in

14   product litigation or product design.

15   **Q.**  We retained you in this case to evaluate Mr. Herrington's

16   or A.G. Design's lantern and contrast that with the function,

17   construction, and features of Mr. Mukai's lantern, correct?

18   **A.**  That's correct.

19   **Q.**  We did not ask you to undertake a detailed evaluation of

20   how the patent itself was set up and structured from a legal

21   perspective, did we?

22   **A.**  No.  I wouldn't be able to do that.

23   **Q.**  Okay, fair enough, I appreciate your candor.

24      What I would like to do is walk Dr. Jorgensen through his

25   report and analysis.  I will try not to be unduly repetitious

1  on what's in his report and focus on the central issues that
2  are relevant here.
3      Dr. Jorgensen, you have the benefit of your report.  If
4  you could, go ahead and walk the court through what you did.
5  And I think you break that down in some detail starting on
6  page 4 of your report under what you call the Detailed
7  Infringement Analysis.
8      Go ahead, and just as a real practical matter, let's walk
9  the court through what it is you did to --
10  A.  Which page?  I am sorry, which page are you on?
11  Q.  I am on page 4 of your report, under the section 5,
12  Detailed Infringement Analysis.
13      Go ahead and explain what it is you did in trying to
14  compare and contrast the design of these two products?
15  A.  Okay.  The main intent, if I understood my job
16  description, was to compare the infringing device which is --
17  and boy I am sure glad --
18  Q.  It would be the yellow one?
19  A.  That's the yellow one.  I have to read.  This device, with
20  the patent.  But at the same time, of course, I had both of
21  the devices so I could compare how the trainman lantern also
22  followed the patent; and therefore I sort of used both of
23  them.  The main conclusions were to look at the trainman, the
24  American Lantern versus the patent claims.
25  Q.  Go ahead and walk us through that analysis.

1  A.  Okay.  What I did was I took the claims and put them in
2  the column on the left-hand side of the report.  Then I
3  examined this device with respect to each of the claims in the
4  patent.
5  Q.  When you say this device, you went through the infringing
6  device to see whether or not it had something that meshed with
7  the claim language in the patent on Mr. Herrington's lantern?
8  A.  Yes, both functionally and operationally.
9  Q.  Okay.  Thank you for laying that out for us.
10     Now, go ahead and walk us through your report and what you
11  found.
12  A.  Do you want me to go through each of the claims --
13  Q.  Let's start with the-- actually, I would.  I don't want
14  you to go into great depth, but I would like you to highlight
15  for the court what your findings were with respect to each
16  claim.
17  A.  Well, the first claim is that it has a reflector
18  comprising of an inner and outer reflective surface.  So
19  obviously I had to take this off and look at the inner
20  reflective surface and the outer reflective surface.
21  Q.  Did you find it existed in both?
22  A.  Yes, I did.
23     Then it says that the inner reflective surface has a
24  generally concave curvature, and it does.
25  Q.  Beyond just a concave curvature, what did you find with

1  respect to your examination?  And I really am drawing on your

2  mechanical engineering background.  What did you find with

3  respect to your side-by-side comparison of these two

4  reflectors?

5  A.  Well, when you start looking at them and you put them

6  together, you see here they are identical in the outer

7  dimension.  And then you start comparing them and you say they

8  are identical in terms of the depth.

9      So I finally actually made detailed measurements of them

10  and found that dimensions of the diameter across here and the

11  depth of the reflector are the same in both.

12  Q.  Now, obviously I am not going to spend a lot of time on

13  this, but obviously there are no port windows in the accused

14  device, Mr. Mukai's device, correct?

15  A.  That's correct.

16  Q.  Now, specifically, while we are talking about the head of

17  the lantern and talking about this outer reflective surface,

18  did both have the identical set up for LED lights for purposes

19  of reflecting off that outer surface of the reflector and

20  creating lateral light?

21  A.  My recollection is that I believe this has four LEDs.

22  Q.  The accused device?

23  A.  Yes, the accused device.  I do believe the A.G. Design

24  only had three.  I would have to open them to look.

25  Q.  Did you do some -- you see the language in the patent we

1    talked about, it talks about the ports and the light coming

2    from the central beam through those ports augments this light.

3        Did you actually do some evaluation of that issue to see

4    whether or not that's really true, whether there is even an

5    augmentation of light?

6    **A.**  Well, there is an augmentation.  Actually, two ways I

7    played with it.  The most accurate probably was the one where

8    I put something over the light.

9    **Q.**  The central beam?

10   **A.**  Yes, I couldn't detect there was a major change in the

11   lighting.  Now obviously if I had a light meter or something

12   like that, then you can do that.

13   **Q.**  What, from your comparison, was the primary predominant

14   source of lateral light on both devices?

15   **A.**  It's the LEDs that provide the primary light in the radial

16   direction.

17   **Q.**  Go ahead and continue.  I interrupted you.

18       Did you have a chance to look, on page 5 you talk about

19   looking specifically at the circuitry relating to that, and

20   continue through your claim analysis, if you could.

21   **A.**  Well, on page 5, there's a plurality of LEDs having beams

22   that are directed towards said outer reflective surface so

23   that we have light reflected in the lateral direction.  Of

24   course, they both have that.  The circuit boards, my

25   mechanical engineering perspective, looks very similar.

1  Q.  Now, there is the one mention on your report, on this
2  section, where you highlight the language in the patent about
3  the plurality of ports.  And of course your comment on
4  Mr. Mukai's lantern is the augmentation features are not
5  found?
6  A.  At that point of course I said the light augmentation is
7  not found in this device.
8  Q.  Continue on to the next claim 2, and speak to that,
9  please.
10  A.  Well, the trainman's lantern of claim 1 -- so this is a
11  sub claim -- comprises a substantially transparent housing
12  mounted generally circumferentially around said reflector so
13  as to enclose said LEDs and outer reflective surface of said
14  reflectors therein."
15      You look at this device and you find that it has the very
16  same housing, the very same -- almost identical shape.  It has
17  the same roughness, and down to the little details -- this
18  just intrigued me.  This is of course the A.G., and it has
19  these little ridges, presumably to strengthen this.  And
20  there's one, two, three -- four of them around.  And you look
21  here and there's one, two, three -- four of them around.  And
22  you know, I kept asking myself, how could two people
23  independently come up with the exact same device.
24  Q.  Is there any difference that you could perceive in the
25  tooling for building those two housings?

1   **A.**  I am really not that much of a manufacturing engineer that

2   I want to get drug into that part of the discussion.  But I

3   presume that the tooling would be very similar.

4   **Q.**  Let me ask you a question, on both devices there's a flat

5   surface where the switch is located.  Do you see that?

6   **A.**  Yes.

7   **Q.**  And then opposite that, if you'll looking on the A.G.

8   lantern, there's another flat surface and there's a similar

9   flat surface on Mr. Mukai's lantern?

10  **A.**  Yes, I see that.

11  **Q.**  Have you come to understand that on the A.G. Design

12  lantern, that was placed there for purposes of putting in a

13  rechargeable plug for those models that had a rechargeable

14  battery?

15  **A.**  Yes, clearly.

16  **Q.**  Is there something similar to that in terms of a flat

17  surface on the accused device that you are looking at there?

18  **A.**  Yes, it is here.

19  **Q.**  All right.  Does it have any function that you can see in

20  that device?

21  **A.**  At this point it doesn't seem to have a function, no.

22  **Q.**  Go ahead, then, if you can turn to the next page of your

23  report and walk the court through your analysis there?

24  **A.**  Well, then, section 3, the trainman's lantern of claim 2

25  further comprises plurality of lenses mounted in said ports to

1  reflect or spread the light passing through them outwardly

2  against the transparent shell."

3       Obviously we are now talking about these four ports that

4  are not -- does not appear in the accused device.

5  **A.**  Okay.

6  **Q.**  Let's move down to No. 4, you talk about the trainman

7  lantern of claim 3?

8  **A.**  That discusses the texture on the outside to help diffuse

9  the light, and it's the same on both.

10 **Q.**  If we could move down to next one, claim 5 -- or item No.

11 5.

12 **A.**  Yes, item 5 describes the inner reflective surface as

13 being parabolic.  I didn't have the necessary tool to

14 accurately measure whether these are parabolic or not.

15      On the other hand, when I measured the dimensions across

16 here and the depth, I found them to be the same.  I presumed

17 if I had a coordinate measuring machine I could have

18 determined whether they were parabolic not.

19 **Q.**  All right.  Did you also notice on the reflective surface

20 that it had the identical faceted and non-faceted zones?

21 **A.**  Yes, this is claim 6, and it says that the lower part has

22 a non-faceted zone.  It extends roughly from the bottom of the

23 reflector up halfway up the wall.  The purpose of that of

24 course is to provide the concentrated central beam of the

25 light.  And then the faceted part comprises the upper.

1      With a central set of calipers, I measured the distance

2   from the top of the -- if you take the ring off, you can make

3   a measurement from the top of the reflector down to the facet.

4   And I did that on both of them.

5      With the accuracy I had, they were within .010 of an inch.

6   And again, you say how can two people independently come that

7   close, it's just amazing.

8   Q.  Your conclusion there is located here on your report.

9   This is functionally identical and geometrically substantially

10  similar?

11  A.  Yes.

12  Q.  You then go on in No. 7, and I will continue on to the

13  next page to talk about the battery case, what were your

14  findings there?

15  A.  Well, they are similar, roughly similar in dimensions.  If

16  I look at the original device, and I look at this diameter

17  versus the infringing device, they are slightly different in

18  geometry in terms of the side walls and the straight parts,

19  but they are certainly identical.

20  Q.  Then you engaged in a side-by-side comparison of both

21  devices and you outline that in your report.

22     Can you walk the court through that, please?  Excuse me, I

23  jumped pages on you, I apologize.

24  A.  We are still on page 7.

25  Q.  Now I am on the bottom of page 7.

1  **A.**  Okay.  We are now coming into the discussion of the bail

2  to hold the lantern alternately in a horizontal and a vertical

3  orientation.

4      This device -- and this is the one that I examined --

5  clearly when you hold the two up, they are geometrically

6  identical.  They may not be perfectly overlapping, but they

7  are certainly identical in terms of having the same rounded

8  part, a straight section, and then how these sections are then

9  made to the housing.

10  **Q.**  You then on the lower portion -- and I have got it

11  highlighted here -- speak to the bail mounting device and the

12  claim language that relates to that.  Can you walk us through

13  that?

14  **A.**  You are talking now on section 8 --

15  **Q.**  Yes.

16  **A.**  Yes, the trainman's lantern of claim 7, further comprising

17  a bail mounted to said battery case for holding said lantern

18  alternately in a horizontal or vertical orientation.

19  Obviously this can be oriented.  It shines out perpendicular

20  to it.  And now it's in a horizontal position.

21  **Q.**  Looking at page 8 of your report, the top, you did a

22  further evaluation of the actual components of the mounting

23  system itself.

24      What was your finding in that regard?

25  **A.**  Well, I found that they had the same parts and in the same

1  order.  That is, starting with the friction washer, the

2  compression washer, and the lock nut.

3      And this was a unique feature of the Herrington device.

4  As Al Herrington explained, it took him quite a bit of time to

5  come up with the appropriate design there so that once you

6  have tightened the nut, it will be -- you could be able to

7  move it in any position that you wanted and it would stay

8  there.  And I presume you could do this day-in and day-out,

9  and at some point in time you may have to retighten it a

10 little bit.  But that was a major part there.  And they are

11 totally identical.

12 **Q.**  Let's move down, if we could, to what you have here as --

13 you have a discussion of the bail and your comparison.

14     Would you explain that, please?

15 **A.**  My understanding was that, in reading this, is that the

16 bail was comprised of a first and second substantially

17 straight, parallel lower leg.  We are talking about these

18 parts (indicating), and the awkward portion connecting the two

19 legs, suspended from fingers of a hand and when said lantern

20 is held in a vertical orientation.

21     So I can hold it this way or I can hold it that way

22 (indicating).

23     I had the pictures here that shows the straight section on

24 both of these.  So they are nearly identical in geometry and

25 certainly similar in operation.

1    Q.  To expedite, you did that with respect to every other

2    aspect of the claim language of the patented device and

3    contrasted that with the accused device?

4    A.  Yes.

5    Q.  In all respects, did you find them to be identical?

6    A.  Yes, that's correct.

7    Q.  I want to just focus, and then I will conclude, let's look

8    down at the conclusion portion of your report, starting at the

9    bottom of page 13 and continuing on to page 14.

10        Can you just briefly walk us through those?

11   A.  Yes.  My first conclusion was that the M2K Lantern copies

12   in a substantial way all the features and geometry described

13   in claim 1 through 16 with the exception of the plurality of

14   ports, which are not found in the Herrington device.

15   Q.  Are not found in the accused device?

16   A.  Yeah, in the accused device, which serve in the Herrington

17   lantern as an augmentation of the horizontal light only.

18        By omitting the ports, the M2K does not improve the

19   patented lantern, but rather reduces the effectiveness of the

20   patented feature or augmenting the lateral light dispersion.

21   Q.  Which you found in your testing to be noticeable but not

22   significant?

23   A.  It was noticeable but not significant.

24   Q.  Okay.  And then the remaining conclusions?

25   A.  Functionally, the M2K mimics the Herrington device in

1    every aspect of operation.

2         The last, the external dimensions of the M2K matches the

3    Herrington device within -- and I really should have put

4    plus-minus -- .015 of an inch giving me a little more leeway

5    in my accuracy of the report or the measurement system.

6    **Q.** Thank you, Dr. Herrington.

7              MR. CHRISTIE:  That's all I have.

8              THE COURT:  I don't know what kind of time the doctor

9    has got, but it's the noon hour now.  How much time do you

10   have, the question is whether or not he should be excused or

11   do we need him around this afternoon?

12             MR. COULTER:  This afternoon would be good.

13             THE COURT:  All right.  Let's take the noon recess

14   now and we will reconvene at 1:30.

15             THE WITNESS:  And I better be around.

16             THE COURT:  Yes, we need you here.  All right.  We

17   will be in recess.

18             THE CLERK:  All rise, court is in recess.

19        (Luncheon recess.)

20             THE COURT:  All right.  You may be seated.

21        Mr. Jorgensen, let me have you back up here.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Okay.

24        Questions?

25

CROSS-EXAMINATION

BY MR. COULTER:

**Q.** Good afternoon, Professor Jorgensen.  How are you?

**A.** Fine.

**Q.** You are fairly soft-spoken, so you have to speak up.  At my age, the hearing has diminished somewhat.

**A.** How is this?

**Q.** That's fine.  I will let you know if I don't hear.

**A.** Let me know if I drift away.

**Q.** Okay.  So, I would like to go back over a little bit what you discussed in the analysis that you wrote --

**A.** Okay.

**Q.** -- for this case.

   So I am going to start with page 4 of Exhibit 23.

**A.** Okay.

**Q.** I am sorry, let's proceed to -- oh, that is page 4.

   Page 4, Detailed Infringement Analysis.

   So my understanding is when you were looking at this, you were looking at the two products side-by-side and looking at them in a claim-by-claim basis; is that correct?

**A.** Well, I had both products, but my comparison was between this device and the claims.  Of course obviously I looked at that, too, and found that the same existed.

   But my interpretation was here's the claim, and here's the device that is accused to be infringing, and that's what I

1    did.

2    **Q.**    To be clear, you compared the claims from the patent to

3    the accused device?

4    **A.**    Yes.

5    **Q.**    And did this analysis?

6    **A.**    Yes.

7    **Q.**    The very first claim, you noticed on the following page of

8    your analysis, page 5, you noticed that the light augmentation

9    is not found on the M2K -- on the right-hand side, a third of

10    the way down?

11    **A.**    That's correct.

12    **Q.**    So I am going to put up just for a second, Exhibit 18,

13    back to the same column, 9 and 10, that we have of the patent.

14        I underlined a couple things here, one being the first

15    claim where we see this, a plurality of ports?

16    **A.**    Hold it a second.    It's easier for me to read from the

17    patent than it is from the screen.    You are at line 40?

18    **Q.**    Yes.    So we have a plurality of ports.

19        Then in claim 3, we also have further comprising a

20    plurality of lenses mounted in said ports in said reflector.

21        Now, if we switch back to the analysis again, can you

22    explain to me how this claim is met by the M2K lantern when it

23    does not have plurality of the ports in the first claim?

24    **A.**    Well, you are now talking about claim 2, right?

25    **Q.**    No, I was talking about -- let's go back for a second, I

1    am sorry.

2        Claim 1, line 40, we were talking about said reflector

3    further comprising a plurality of ports.

4    **A.**    Yes.

5    **Q.**    In your analysis you note that's not there?

6    **A.**    Wait a minute, that where I said the light augmentation is

7    not found on the M2K.

8    **Q.**    Okay.   So what is the augmentation?

9    **A.**    Well, the plurality of ports formed in said reflector that

10    permit light from the primary source to pass through in a

11    lateral direction so as to augment the light from said at

12    least one or secondary source, and so on.

13        So I am just saying that the claim talks about light

14    augmentation through these ports.   And I guess to be very

15    specific, I could say these ports do not -- it's not found on

16    the M2K device, but I just happen to say -- I just happen to

17    pick up the light augmentation.

18    **Q.**    Instead of ports?

19    **A.**    Okay.

20    **Q.**    Then the plurality of ports does not exist in the M2K?

21    **A.**    That's correct.

22    **Q.**    Going back to the patent, Exhibit 18.   Can I get these

23    side by side?  It may be easier.

24        The trainman lantern of claim 2, and claim 2 includes

25    claim 1, the trainman lantern of claim 2, further comprising a

1  plurality of lenses mounted in said ports in said reflector.

2      Then back to your analysis, page -- my copy isn't very

3  good, page 6, figure 8, just underneath that you note the M2K

4  lantern does not have a lateral light augmentation system as

5  described in claim 3.

6      So it does not read on this claim either?

7  **A.**  No, that's correct.

8  **Q.**  Going to column 10 of the patent, Exhibit 18, at line --

9  claim 12, starting at just under line 45, we have an

10  incandescent bulb mounted centrally with an interior of said

11  reflector.

12      Does that exist in the accused device?

13  **A.**  Yes.

14  **Q.**  It does?

15  **A.**  Yes.  It's an incandescent bulb mounted centrally with an

16  interior of said reflector so that light from said bulb is

17  reflected to said inner surface of said reflector so as to

18  form a relatively concentrated beam; yes, it is.  Aren't we

19  talking about this right here?

20  **Q.**  We are talking about the accused device, the current

21  trainman lantern from my client?

22  **A.**  That's the one I am holding in my hand, isn't it?  It says

23  American Lantern Company, M2K Trainman Lantern, Model

24  ALC-1008.

25  **Q.**  I am sorry, maybe there's confusion.

1          MR. COULTER:  Which one is sitting in front of Your
2    Honor?  May I approach the bench?
3          THE COURT:  This is the one admitted.  Is it any
4    different than that one?
5          MR. CHRISTIE:  The one that I submitted as an
6    exemplar was admitted as the one that's in Dr. Jorgensen's
7    hand.
8          THE COURT:  All right.  Then hand him this.  Put them
9    both there.
10      Now, your question, that's the one you want to ask the
11   question about?
12         MR. COULTER:  It is.  This is the current lantern.
13         MR. CHRISTIE:  Your Honor, there hasn't been any
14   foundation that's the current lantern.  That's not the one my
15   client either had or had Dr. Jorgensen examine.  I don't
16   expect him to be examining on something he's never seen before
17   or done an evaluation on.
18         MR. COULTER:  I will withdraw the question.
19         THE COURT:  All right.  Get that back.
20   BY MR. COULTER:
21   Q.  Sir, going down just a little bit further, Dr. Jorgensen,
22   we have a statement, just under 50, "Said bulb being mounted
23   approximately level with said ports in said reflector."
24      Does the accused device have a bulb of any kind that's
25   level with said ports in said reflector?

1  **A.**  Well, you started out "said bulb being mounted

2  approximately level with said ports in said reflector, so that

3  the light therefore passes through the lenses outwardly

4  against and through the transparent housing."  So now we are

5  talking about the light being --

6  **Q.**  Basically I am asking if the accused device has ports that

7  can satisfy this requirement?

8  **A.**  The accused device does not have ports.

9  **Q.**  Okay, thank you.

10      So going back to your analysis, you note that on page 11,

11  No. 6 --

12  **A.**  Page what.

13  **Q.**  Page 11?

14      THE COURT:  Of what?

15      MR. COULTER:  Of the analysis of Mr. Jorgensen, which

16  is Exhibit -- Plaintiff's Exhibit No. 23, the one we have been

17  looking at.

18  BY MR. COULTER:

19  **Q.**  Are you there?

20  **A.**  I got it here.

21  **Q.**  So 6a., just below the picture, it starts off with "one is

22  stricken by the clear impression that the M2K is an identical

23  copy or knock-off of the Herrington lantern."

24      Do you still maintain that?

25  **A.**  Yes, I do.

1   **Q.** Is it a knock-off in the way it looks?

2   **A.** Well, it's a knock-off to the way it looks, to the way it

3   functions, and even to the dimensions.

4   **Q.** How is it a knock-off in function?  We have at least three

5   or four claims that don't read at all on the accused device?

6            MR. CHRISTIE:  Object to the form.  It's

7   argumentative.

8            THE COURT:  Do you understand the question?

9            MR. COULTER:  I can rephrase it.

10  BY MR. COULTER:

11  **Q.** He has three claims that do not read -- we have three

12  claims in the patent that are not apparent in the accused

13  device out of not very many claims.  How can it be a knock-off

14  off when the accused device is failing on at least three

15  claims?

16           MR. CHRISTIE:  Object to the form.

17           THE COURT:  The form of the question may be bad.  He

18  wants to know the difference.

19  **A.** Well, there is no significant difference, if I get your

20  question right.  If you look through all the claims, and

21  particularly if you take the claims in combination with the

22  summary of the invention where the inventor says how things

23  are intended, that I'm going to produce a beam that shines out

24  and I got to produce a lateral beam.

25      To make those two beams, I have two sources, a primary

1    source, this bulb, and I have the secondary LEDs.

2        By putting in the ports, I can augment it, but it's clear

3    from the intention of the inventor, and what is written, that

4    those two sources are the main sources.  And it will actually

5    function fine without the ports.  And I proved that to myself.

6    BY MR. COULTER:

7    **Q.**  So the accused device doesn't infringe the patent

8    identically, it just does the exact same thing?

9    **A.**  It infringes in the sense that it does the same thing.

10   **Q.**  Dr. Jorgensen, did you review the Patent File Wrapper when

11   you were evaluating the device?

12   **A.**  What?

13   **Q.**  Are you familiar with the term File Wrapper for the

14   patent?

15   **A.**  No, I am not.  Is this the prehistory before it's --

16   **Q.**  Yes, sort of before issued.

17   **A.**  All right.

18   **Q.**  In any previous patent litigations where you've been

19   called as an expert witness, have you ever reviewed the File

20   Wrapper or the prosecution history?

21   **A.**  No, I have not.

22   **Q.**  So why is it that that's not something that you would do

23   when you are looking at a patent infringement issue?

24   **A.**  I am not sure I can give you a definite answer on that.  I

25   do remember in the Precor case some discussion came up as to

1  the history of it, you know, the lawyers were giving me a

2  little brief scenario about it, but I was not requested to

3  read it.

4           MR. COULTER:  No further questions.

5           THE COURT:  All right.

6           MR. CHRISTIE:  Very briefly, Your Honor, just two

7  quick points here.

8                    REDIRECT EXAMINATION

9  BY MR. CHRISTIE:

10 Q.  Dr. Jorgensen, in your review of the patent itself -- and

11 that again is Exhibit 18, I think you've had it in front of

12 you -- it contains some figures, is it your understanding that

13 the figures, the drawings, the mechanical drawings, are part

14 of the patent?

15 A.  Yes.  You are talking now about the figures relating in

16 the patent itself?

17 Q.  Yes.  And because it's been admitted, I am just going to

18 put one sheet of those figures up here.

19      When you reviewed the accused device and compared it

20 against the claims, did you also read the entire patent and

21 look at the figures?

22 A.  Of course I did.

23 Q.  From a mechanical standpoint, in terms of the construction

24 and mounting of the handle, all the details of this drawing,

25 which is figure 1, and this drawing, figure 5, did you find --

1  and again, I am not talking about the holes cut in the window,

2  we've already beat that horse -- was there any difference from

3  your perception at all between the accused device and the

4  patented device?

5  A.  No, none at all.

6  Q.  And the dimensionality that you mentioned, I think there

7  was a measurement difference plus or minus, what was that

8  number gain?

9  A.  Roughly .005 of an inch.  There might have been something

10  a little larger; I can't remember that quite now.

11  Q.  I am going to throw a quick question at you, you may or

12  may not know the answer to, I am trying to get a visual

13  reference of .005 of an inch, how does that compare with a

14  hair off my head?

15  A.  I believe some people say that the thickness of typical

16  paper is .002 or .003 of an inch, so we are talking about

17  maybe two or three thicknesses of a piece of paper.

18  Q.  Okay.  Thank you.

19        MR. CHRISTIE:  Thank you, Your Honor.  No other

20  questions.

21        THE COURT:  All right.  This witness can be excused?

22        MR. COULTER:  Yes, no questions.

23        MR. CHRISTIE:  We are prepared to call Mr. Mukai as

24  an adverse witness Your Honor.

25        THE COURT:  All right.  Mr. Mukai.

1          MARCUS MUKAI, called as a witness, duly sworn.

2              THE COURT:  Just come around and take the witness

3    chair.

4              MR. CHRISTIE:  Dr. Jorgensen wanted to know if he's

5    excused.

6              THE COURT:  I think everybody said he could be

7    excused, so you are excused and free to go.

8              THE WITNESS:  Thank you, sir.

9                         DIRECT EXAMINATION

10   BY MR. CHRISTIE:

11   Q.  Could you please state your name and your residence

12   address for the court reporter?

13   A.  Marcus Mukai, M-A-R-C-U-S M-U-K-A-I.  4929 88th Avenue

14   West, University Place, Washington, 98467.

15   Q.  Mr. Mukai, by background, you are an actor?

16   A.  About 30 years ago, yes.

17   Q.  You were an actor of some prominence?  You've been in a

18   television series?

19   A.  I wouldn't characterize it as prominent otherwise I'd

20   still be probably doing it, but I did some acting about

21   30-plus years ago.

22   Q.  You have no professional training as an engineer; is that

23   correct?

24   A.  That's correct.

25   Q.  You've never worked or taken educational courses in

1   mechanical drawing or engineering or any field related
2   thereto, correct?
3   **A.**  I am sorry, any what?
4   **Q.**  Any field related thereto?
5   **A.**  As far as instructional training?  Or training on the job?
6   **Q.**  Instructional training, formal training?
7   **A.**  No.
8   **Q.**  You've never worked as an engineer?
9   **A.**  No.
10  **Q.**  You may have played an engineer, but you've never worked
11  as an engineer, correct?
12  **A.**  I did functions and have been, yes, involved in projects
13  that involved engineering.
14  **Q.**  You have never sought a patent on a device, correct?
15  **A.**  No.  I mean yes, that's not correct -- I am sorry, restate
16  your question.
17  **Q.**  Sure.  Have you sought a patent on a device?
18  **A.**  No.
19  **Q.**  You haven't invented anything?
20  **A.**  Sure.
21  **Q.**  Have you ever invented anything for which you sought legal
22  protection?
23  **A.**  No.
24  **Q.**  Now, I notice, respectfully, that you seem to be humored
25  or laughing about the events here.  Were you taking light of

1  the events of this particular proceeding?

2          MR. COULTER:  Objection, argumentative.

3          THE COURT:  You can answer that.  Do you understand

4  the question?

5          THE WITNESS:  No.

6  BY MR. CHRISTIE:

7  Q.  You understand the question?

8  A.  Yes.

9  Q.  Could I direct you, please, to Exhibit 9 that's in front

10 of you.  That would be Plaintiff's Exhibit No. 9.

11     Now, you know my client, Al Herrington, don't you?

12 A.  Yes.

13 Q.  You met him in approximately the year 2000?

14 A.  Yes.

15 Q.  And you subsequently began working for him as a

16 representative of his product that was in development,

17 trainman lantern, correct?

18 A.  Eventually, yes.

19 Q.  I am showing you Exhibit 8 that's been admitted into

20 evidence -- excuse me, Exhibit 9.  Can you look at that

21 document and confirm for me that this is your signature on the

22 last page of this document which is entitled "Non-exclusive

23 Sales Representative Agreement."

24 A.  It is my signature on the last page that says "Counsel

25 Review".

1   **Q.**  The very bottom says "Representative".  There's a

2   signature line, under which it says Marcus Mukai, and there's

3   handwriting.  Is that your handwriting?

4   **A.**  Yes.

5   **Q.**  In addition to entering into this non-exclusive sales

6   agreement with my client, you also executed, along with your

7   brother, Scott, a letter of intent, correct?

8   **A.**  Well, first of all, I did not execute this agreement.

9   **Q.**  You said that was your signature?

10  **A.**  It is my signature on this particular page marked "16

11  Counsel Review".  The other portions of this agreement I have

12  never seen until this court action.

13  **Q.**  In addition to signing this particular document, there's

14  another document the court has looked at that you've also

15  signed and that's the letter of intent.  Do you recall seeing

16  that, and I will direct you to that, that is found at --

17  **A.**  I am sorry, I am having a hard time understanding how you

18  are referring to my signature on this particular document.

19  I am not acknowledging I signed this document.  As a matter of

20  fact, to the contrary.  I have never seen the preceding pages,

21  other than the one I signed.

22      I acknowledge I signed the last page.  The preceding

23  pages, I do not claim to ever have seen or read.

24  **Q.**  Your testimony is that you signed this single page in

25  blank without it being attached to anything; is that your

1    testimony to this court?

2    **A.** I don't remember what pages preceded these. But I do not

3    recall for a certainty that I signed the language, that I had

4    been able to review, that's contained in these pages.

5    **Q.** You fully reviewed this document before coming here today,

6    correct?

7    **A.** Yes, I did several times.

8    **Q.** Now, I am going to direct your attention to Exhibit 14.

9    Would you confirm for the court that exhibit 14 is your

10   signature on a letter of intent that your brother and you

11   signed with Mr. Herrington?

12   **A.** Yes, that is my signature.

13   **Q.** As a result of these documents that I have shown to you,

14   would you agree with me that you were given access, unfettered

15   access to confidential business information of A.G. Design?

16   **A.** Some confidential information, yes.

17   **Q.** You were given access to financial records?

18   **A.** Yes.

19   **Q.** You were given access to design drawings relative to a

20   trainman lantern?

21   **A.** No.

22   **Q.** You were given detailed information concerning pricing and

23   sourcing for the component parts of a trainman lantern?

24   **A.** I don't recall seeing a breakdown of, down to the

25   components and the prices for those specific components, no.

1  Q.  You certainly received information concerning the unit

2  cost to manufacture and assemble a trainman lantern by A.G.

3  Design, correct?

4  A.  Yes.

5  Q.  You also received personal introductions by Mr. Herrington

6  to people within the train industry to whom he was attempting

7  to sell this particular device?

8  A.  Correct.

9  Q.  You also received unfettered access to Mr. Herrington's

10  personal account of how he went about designing and

11  manufacturing what turned out to be the patented device,

12  correct?

13  A.  I am sorry, personal account?

14  Q.  Yes.  He would describe to you the same thing he's told

15  this court in terms of what he went through to try to figure

16  out how to design the mounting system for the bail, why he has

17  facets on the reflector, that level of detail?

18  A.  Some, yes, but not everything I heard today.

19  Q.  Was there ever a question that you asked Mr. Herrington

20  about how he came about to invent this device that he didn't

21  answer for you?

22  A.  That I don't know.

23  Q.  In point of fact, you knew under the terms of the

24  agreement that you had with A.G. Design that by providing you

25  with access to this information, you could not use it to

1  compete against Mr. Herrington; is that correct?

2  **A.**   Correct.

3  **Q.**   You also knew that you were being given confidential

4  information on the promise that when you departed company,

5  when you were no longer in a business relationship, you would

6  return that to him, correct?

7  **A.**   I don't believe that was part of our agreement, no.

8  **Q.**   Now, you brought in today with you a prototype lantern of

9  A.G. Design, correct?

10  **A.**   Well, bits and pieces, yes.

11  **Q.**   Well, specifically the reflector with the balls in it is a

12  prototype?

13  **A.**   You'd have to define prototype to me --

14  **Q.**   Prototype, the sample.

15  **A.**   -- by what you mean.

16  **Q.**   Is a sample, it's part of the experimental process of

17  developing the final device?

18  **A.**   Well, I recall us being way beyond the experiment stage.

19  We were offering these and actually advertising this

20  particular lantern configuration to the railroads,

21  specifically CSX.

22  **Q.**   Do you have one document in your possession authored by my

23  client that shows him ever marketing for sale that prototype

24  device?

25  **A.**   That was my job.

1  Q. So you have not produced here anything that A.G. Design
2  ever authored that listed that prototype device for sale; is
3  that correct?
4  A. I believe we have purchase orders from CSX.  Maybe I don't
5  understand what you are asking.
6  Q. Perhaps you don't.  Your counsel will clear it up in his
7  questioning of you.
8      How many of these devices with the balls glued into the
9  openings were assembled or made, do you know?
10 A. I don't know.
11 Q. So you are not in a position to dispute Mr. Herrington's
12 testimony that there were six total?
13 A. Well, the fact that I have three of them in my possession
14 kind of strikes me as odd if there's only six in the known
15 universe, yes, that would surprise me.
16 Q. You've never seen more than six, have you?
17 A. I believe I have.
18 Q. You have three of these?
19 A. Yes, in one form or another.
20 Q. So you did not return to A.G. Design or Mr. Herrington,
21 the property that you collected from him during the course of
22 your role as a sales representative; is that a correct
23 statement?
24 A. That's not correct.
25 Q. How could it be that you have them in your possession and

1    you returned them?  Those are inconsistent, are they not?

2    **A.**  No, it's not.

3    **Q.**  You have never returned the other lanterns to

4    Mr. Herrington, have you?

5    **A.**  No, I have not.  These lanterns did not come from

6    Mr. Herrington.  These lanterns came from customers as a

7    return, because they were broken.

8    **Q.**  Who invented your trainman lantern?

9    **A.**  It's a combination and a compilation of different input

10   from railroad engineers, safety engineers, railroad employees,

11   my brother, lighting engineers and designers.

12   **Q.**  Is it coincidence or by design that your light, with the

13   exception of port openings, is identical to Mr. Herrington's

14   patented device?

15   **A.**  They are not identical.

16   **Q.**  The battery case of the two devices is virtually

17   identical, would you agree with me?

18   **A.**  That's incorrect.

19   **Q.**  So you are making a distinction between the slight

20   variation and geometric shape of them?

21   **A.**  I would be more than happy to demonstrate that the height

22   of my lantern case is a lot higher than two sheets of paper

23   from your expert engineer, yes.

24   **Q.**  Who makes your case?

25   **A.**  The plastic case?

1    Q.    Yes.

2    A.    China.

3    Q.    Who?

4    A.    Wai Kit.

5    Q.    What's their address?

6    A.    I don't have the address.

7    Q.    Who is your contact there?

8    A.    A lady by the name of Ms. Wang, W-A-N-G.

9    Q.    How is it that you reach her?

10   A.    Email.

11   Q.    What's her email address?

12   A.    I don't know that off the top of my head.

13   Q.    Who makes your bail handle?

14   A.    Same people.

15   Q.    Is the dimension of your bail handle identical to the

16   thick portion of Mr. Herrington's bail handle?

17   A.    Definitely not.

18   Q.    Is the mounting system used for your bail handle made up

19   of the same component pieces as Mr. Herrington's?

20   A.    No.

21   Q.    Who invented your bail mounting system?

22   A.    Two washers and a lock nut, I bought them at Home Depot,

23   so wherever those came from.

24   Q.    Is it your testimony to this court that you came up with

25   your mounting system independent of what you learned by

1    examining Mr. Herrington's mounting system?

2    A.   During the course of the development --

3    Q.   Could you answer my question yes or no?

4    A.   We took a look --

5         MR. CHRISTIE:   Your Honor, in fairness I think my

6    question could be answered yes or no.

7         THE COURT:   Can you answer the question?

8         THE WITNESS:   Can you repeat the question?

9         MR. CHRISTIE:   I will have the reporter read it back,

10   please.

11        COURT REPORTER:   "Question:   Is it your testimony to

12   this court that you came up with your mounting system

13   independent of what you learned by examining Mr. Herrington's

14   mounting system?"

15   A.   No, I wouldn't say that.

16   BY MR. CHRISTIE:

17   Q.   How did it come to pass that you decided to put a pebbling

18   surface on the clear portion of the front basket?  Is that

19   something you came up with?

20   A.   I am sorry, the front what?

21   Q.   The front part of the lantern, the clear portion, the

22   clear lens.   How is it that you came to decide to put a

23   pebbling surface on that?

24   A.   Originally we had a very clear head, and the result was we

25   would get a pin point of light emitted from the dials

1  underneath.  We wanted to spread that out so we used the

2  texturing that China recommended in order to spread that

3  pattern out.

4  Q.  Is the same person that you identified the person or the

5  company that manufactures all the component parts of your

6  lantern?

7  A.  I don't know.  I have never been to the facility.  I don't

8  believe she is.  I believe she gets the components from all

9  different factories.

10  Q.  Do you deal with a middleman or middle person?

11  A.  I deal with Ms. Wang.

12  Q.  Directly?

13  A.  Well, through an interpreter.

14  Q.  What's the name of your interpreter?

15  A.  Whoever is on the other end of the phone at that time.

16  I'm never introduced to the interpreter by name.

17  Q.  Okay.  Now your talking about "we", "we" did this and then

18  "we" ended up with a pebble design.

19     Is the "we" Mr. Herrington or somebody else?

20  A.  American Lantern.

21  Q.  Your company?

22  A.  Yes.

23  Q.  How -- let me ask it this way, is the fact that you ended

24  up with a pebbled surface on your clear lens the product of

25  your own work or was it influenced in any way by A.G. Design

1    lantern?

2    **A.**  I would have to say since it was a good design, we were

3    obviously influenced by A.G.'s design, just like any other

4    company that turns out a viable product.

5    **Q.**  Well you copied it, correct?

6    **A.**  I am sorry?

7    **Q.**  You copied it?

8    **A.**  I copied what --

9    **Q.**  You copied --

10   **A.**  -- the texture?

11   **Q.**  -- Mr. Herrington's design and use of the pebbled exterior

12   surface on the clear lens?

13   **A.**  No, I believe his texturing, upon closer examination, is

14   much denser than ours.   But if you want to say texturing

15   versus texturing, yes, we have texturing similar too the A.G.

16   texturing.   We just have less of it.

17   **Q.**  You copied the bail mounting system that Mr. Herrington

18   invented, didn't you?

19   **A.**  The washers and lock nut, no, I believe we used slightly

20   different size washers.

21   **Q.**  You copied the concept of a reflector lens with inner

22   reflector and outer reflector surfaces so that you could

23   create lateral light by the use of LEDs, correct?

24   **A.**  No, that's not correct.

25   **Q.**  You came up with that on your own?

1  **A.**  No.

2  **Q.**  Who came up with that?

3  **A.**  Whoever Ms. Wang conferred with in China.

4  **Q.**  So you contacted Ms. Wang and said "can you make a light

5  for me and I will leave it up to you to figure out how to

6  create lateral light," is that correct?

7  **A.**  No.

8  **Q.**  Did you provide Ms. Wang with a copy of A.G. Design's

9  lantern?

10  **A.**  No.

11  **Q.**  Did you provide Ms. Wang with any design drawings,

12  specifications, or any information concerning Mr. Herrington's

13  device?

14  **A.**  No, we didn't have any drawings or specifications.

15  **Q.**  You had copies of the -- you had exemplars of the lantern

16  itself, correct?

17  **A.**  Samples?

18  **Q.**  Yes.

19  **A.**  Yes, we had some samples.

20  **Q.**  Is it your testimony to this court that it is through

21  coincidence that your lantern is as close in design, function

22  and appearance as it is to Mr. Herrington's lantern?

23  **A.**  I can't answer that.  I don't believe they are that

24  similar except by an appearance only.  By function, no, I

25  totally disagree with that.

**Q.**  In terms of appearance, is it your testimony to this court
that that is a coincidence?

**A.**  I don't know how to answer that coincidence.

**Q.**  Why?

**A.**  Well, by coincidence, what, I don't understand what you
mean.  We took a lot of effort and time, and a lot of thought
process went into the ultimate lantern that we developed.

It took us over three years to come up with what we felt
was a product that no other lantern manufacturer had or has
today.

And I totally disagree with Mr. Herrington's and your view
that our lantern is similar --

MR. CHRISTIE:  Could he answer the question and save
argument for later?

THE COURT:  Mr. Mukai, your counsel will argue your
case.  When you get a question, do your best to answer the
question.

THE WITNESS:  Thank you, Your Honor.

BY MR. CHRISTIE:

**Q.**  Would you agree with me that to achieve the function of
creating lateral light from the LEDs, that you did not feel it
was at all necessary to include port windows in your
reflector?

**A.**  I am sorry, can you ask that again?

**Q.**  Sure.  Would you agree with me that you did not feel that

1  it was necessary to put port windows in your reflector in

2  order to achieve an adequate amount of lateral light from your

3  LEDs?

4  **A.**  Yes, I felt it was not necessary to have ports in my

5  reflector because they were obsolete with the type of center

6  spot beam bulb we were using.

7  **Q.**  From your perspective, your lantern is in fact superior to

8  Mr. Herrington's lantern by virtue of the fact that it does

9  not have ports?

10  **A.**  No, I wouldn't say that.

11  **Q.**  It's certainly equivalent, correct?

12  **A.**  I am sorry, what?

13  **Q.**  Your lantern is equivalent in its ability to present light

14  laterally without ports?

15  **A.**  No, not at all.

16  **Q.**  Is it inferior?

17  **A.**  Yes.

18  **Q.**  But you felt it was certainly adequate for your purposes

19  of marketing the lantern?

20  **A.**  The jury is still out on that, counsel, because we are

21  still in the process of developing our product.

22  **Q.**  The people that you are talking to in Market Railway you

23  know are the same people that Mr. Herrington deals with,

24  correct?

25  **A.**  I have never, to my knowledge, spoken to anyone from Rail

1   Marketplace.

2   Q.  Anyone that's in the procurement side of the railroad

3   business that you deal with are the same individuals that

4   Mr. Herrington deals with, correct?

5   A.  The only two names that Mr. Herrington mentioned this

6   morning that I have knowledge of are George Day, who's the

7   safety engineer from Union Pacific Railroad in Omaha, whom I

8   believe I introduced Mr. Herrington to.  And Jim Mathews,

9   prior to October of 2006, I never knew who Jim Mathews was.  I

10  got a call from him.

11  Q.  Do you know enough about how the purchasing is done by the

12  railroad industry to believe that there is major overlap in

13  the people that you deal with to sell your lantern and those

14  that Mr. Herrington deals with to sell his lantern?

15  A.  I believe -- I am sorry, overlap?

16  Q.  Overlap.

17  A.  You mean we know the same people?

18  Q.  Yes.

19  A.  Why sure we run into the same people.

20  Q.  You market to the same people, correct?

21  A.  Well, those are the only two people.  I am sorry, Nick

22  Lesey was the third from Canadian National.  I have not spoken

23  to him face-to-face.  Actually, I haven't spoken to any of the

24  three gentlemen face-to-face.  We've all communicated by

25  email.  But they showed an interest through Jim Mathews at

1  Norfolk Southern to obtain our samples, and we provided those

2  samples.

3  Q.  Would you agree with me that there's one set of decision

4  makers, setting aside who those are at this given point in

5  time because they change, there are one set of decision makers

6  for making the ultimate decision about whether to purchase

7  your lantern or Mr. Herrington's lantern?

8  A.  I believe there are more than one set of people.  I

9  believe it goes all the way from safety engineers, to

10  procurement, to train masters, to supervisors, and then

11  testing procedure.

12      It's a very lengthy process.

13  Q.  If we take all those people together, those are the same

14  people that will be involved in evaluating your lantern and

15  Mr. Herrington's lantern, correct?

16  A.  Without regard to name?

17  Q.  Yes.

18  A.  Probably, by title, yes.

19  Q.  You understood fully that in your development and sale of

20  your lantern, that you were competing with Mr. Herrington?

21  A.  I am sorry, can you repeat that?

22      MR. CHRISTIE:  I will have the reporter read it back.

23  If you don't understand it, I will rephrase it.

24      COURT REPORTER:  "Question:  You understood fully

25  that in your development and sale of your lantern, that you

1  were competing with Mr. Herrington?"

2  **A.**  We haven't had any sales, but the first part of your

3  question is yes.

4  BY MR. CHRISTIE:

5  **Q.**  Was there any doubt in your mind you are competing

6  directly against his lantern for ultimate sales in the

7  railroad marketplace?

8  **A.**  Yes, because they're two different products.

9  **Q.**  Who's Jason Technologies?

10  **A.**  That was an old DBA I used, it's an individual, not a DBA,

11  it's a -- what do you call it when it's just yourself?

12  **Q.**  Sole proprietor?

13  **A.**  Sole proprietor.

14  **Q.**  Who is Jason?

15  **A.**  My son.

16  **Q.**  Why do you sell or market lanterns under his name?

17  **A.**  You know, I don't believe I ever have except for A.G.'s

18  product when I was associated with Mr. Herrington.  Again, I

19  was an independent contractor, so I had to have a name, and I

20  used Jason Technologies as a name.

21  **Q.**  Why, in October of 2006, did you seek to purchase from

22  A.G. Design one of his LED lanterns?

23  **A.**  I wanted to get examples and samples from a wide range of

24  vendors who were producing not only railroad lights but any

25  lanterns; Garrity, McDermott, A.G. Design.

1    Those were the leading companies in the nitch market of

2    lanterns using 6 volt batteries that I could think of.  And I

3    scoured the universe through the internet looking for who had

4    emerging technology.

5    When Mr. Herrington told me about his LED or a possibility

6    that he was working on an LED based lantern, who wouldn't want

7    that.

8    **Q.**  It's your present effort to incorporate LED technology in

9    your primary bulb, correct?

10   **A.**  I am sorry, one more time.

11   **Q.**  Let me ask the question differently.  Did you also seek to

12   purchase from A.G. Design, in October of 2006, the details of

13   its rechargeable battery technology?

14   **A.**  I tried to buy one of their batteries.  I asked Al if he

15   had a battery for sale -- I am sorry, I asked Al if he had

16   that particular battery on the market yet.

17   **Q.**  And was it your intent to copy that and incorporate that

18   into your lantern?

19   **A.**  No.

20   **Q.**  You don't purport to present to this court that you are

21   marketing your lantern to anyone other than those in the

22   railway business, are you?

23   **A.**  Initially, no.  It was a sportsman lantern.  It evolved in

24   October 2006 into more of a railroad application after being

25   contacted by Norfolk Southern.

1  Q.  The lantern that is sitting next to you, your yellow

2  lantern, you are marketing exclusively to railroads, correct?

3  A.  Today we are, yes.

4  Q.  You understood that in competing directly against

5  Mr. Herrington and A.G. Design that you were in violation of

6  your agreements with him, correct?

7  A.  Did you say "agreements"?

8  Q.  Agreement, specifically the non-exclusive sales

9  representative agreement, Exhibit 9, that you signed?

10  A.  No, I don't believe we ever executed that document.

11  Q.  Did you believe you had an oral agreement not to compete

12  against him?

13  A.  No.

14  Q.  Are you an honorable person in terms of your business

15  dealings?

16  A.  Yes.

17  Q.  And you felt no compunction whatsoever about developing

18  and marketing your lantern in the face of the information that

19  you learned from A.G. Design and your business relationships

20  with them, is that your testimony to this court?

21  A.  I am sorry, the first part of the question again was what?

22       MR. CHRISTIE:  I will have the reporter read it back.

23  If you don't understand it, I will rephrase it.

24       COURT REPORTER:  "Question:  And you felt no

25  compunction whatsoever about developing and marketing your

1   lantern in the face of the information that you learned from
2   A.G. Design and your business relationships with them, is that
3   your testimony to this court?"
4   **A.**   I am going to have to say no, that's not my testimony.
5   BY MR. CHRISTIE:
6   **Q.**   Why did you design facets into your reflector?
7   **A.**   Well, we tried an all smooth reflector and the throw was
8   very limited.   We wanted a broad range of light to be
9   available from different distances and different focal points.
10   And the only way to do that was to get a multifaceted row of
11   reflector patterns at the leading edge of the reflector, with
12   a solid smooth surface underneath.
13       So we tried out many different designs.   Mr. Herrington
14   had a great design, and Garrity also had some great designs.
15   We took a look at all the designs out there.   We did our own
16   internal testing, and China made the final decision.
17   **Q.**   Have you counted the facets on the surface of your
18   reflector and compared those to Mr. Herrington's?
19   **A.**   Not really.
20   **Q.**   If they are identical, would that be coincidence?
21   **A.**   Identical number?
22   **Q.**   Yes.
23   **A.**   I don't know.   I don't know what the coincidence level
24   would be, but no, I don't know.
25   **Q.**   What if they were identical in shape and number, would

1  that be coincidence?

2  **A.**  A good coincidence, very high coincidence.

3  **Q.**  You copied his reflector in terms of its design, did you

4  not?

5  **A.**  I did not, no.

6  **Q.**  China did?

7  **A.**  I don't believe they did.

8  **Q.**  You keep putting this off as someone who's not here in

9  this courtroom.  The person who manufactures products for you

10  ultimately did so based on what you told them to do or

11  authorized them to do, correct?

12  **A.**  That's not correct.

13  **Q.**  Are you marketing a product that's not yours?

14  **A.**  No, I am not marketing a product that's not mine.

15  **Q.**  The product that you put out for sale, before it is

16  purchased, is owned by you and your company, correct?

17  **A.**  Correct.

18  **Q.**  100 percent?

19  **A.**  Nearly 100 percent, yes.

20  **Q.**  Who owns the rest?

21  **A.**  Other people.

22  **Q.**  Who?

23  **A.**  Other entities.

24  **Q.**  Who?

25  **A.**  I don't have a name.  I am sorry, they are my brother's

1  business partners.  That's his end of the piece.

2  **Q.**  Is your brother an owner in your business?

3  **A.**  Yes.

4  **Q.**  That makes and sells these lights?

5  **A.**  He is an owner of the company, yes.

6  **Q.**  Do you have documents that would reflect the paper trail

7  of design that resulted in the final product that we have here

8  today?

9  **A.**  I don't.

10  **Q.**  Who does?

11  **A.**  China.

12  **Q.**  China is a big country.  Could you be more precise?

13  **A.**  Schezhen, Wai Kit.  Schezhen, Hong Kong.

14  **Q.**  Are you guessing or do you know?

15  **A.**  It's all over the place, counsel.  I cannot -- it's like a

16  product being made in Western Washington.  It's not at -- I

17  can't give you an address.

18  **Q.**  Do you possess design drawings of your lantern?

19  **A.**  No.

20  **Q.**  Who does?

21  **A.**  I am going to have to say I don't know, only because I

22  can't give you a name and I can't give you an address of where

23  those might reside.

24  **Q.**  Do you possess any documents that would reflect the design

25  process and the evolutionary process of coming up with the

1  final design of your lantern?

2  **A.**  Not so much in mechanical drawings or architectural type

3  drawings, blueprints, that's not how our lighting designers

4  and developers approached this particular problem.

5  **Q.**  I am sorry, do you have any of that or do you not?

6  **A.**  Do I?  No, I don't.

7  **Q.**  Does your brother?

8  **A.**  No, I don't think so.

9  **Q.**  Do any of his business partners?

10  **A.**  Oh, no.

11  **Q.**  Does anyone located in the United States have any of the

12  drawings, writings, any documents that would show the

13  evolutionary process that you have testified was gone through

14  in order to come up with your final design?

15  **A.**  No.

16  **Q.**  So if I was to request every document, written or

17  electronic, that exists in the United States of America that

18  would show any aspect of the development and design of your

19  lantern, none of that would exist, is that your testimony?

20  **A.**  No, specific blueprint type drawings would exist, but --

21  **Q.**  That's not what I asked.  My question is very broad.

22  **A.**  I am sorry, can you say that again?

23  **Q.**  Are there in the United States any electronic stored

24  information or written information that in any way documents

25  the process of design as you have described it that resulted

1    in your final lantern?

2    **A.**  Probably not.

3         MR. CHRISTIE:  I am just about done, Your Honor.  Let

4    me just quickly look through my notes.

5    BY MR. CHRISTIE:

6    **Q.**  You mentioned Wai Kit, is that your agent for design and

7    production?

8    **A.**  I am sorry, my agent for what?

9    **Q.**  Both design and production?

10   **A.**  Probably not.

11   **Q.**  Who else would be involved, and what would their role be?

12   **A.**  Again, we have not selected a production facility yet.

13   **Q.**  You have not produced your lantern yet?

14   **A.**  That's correct.

15   **Q.**  How many total lanterns do you have in your possession?

16   **A.**  Two.

17   **Q.**  How many total lanterns to your knowledge exist?

18   **A.**  Six.

19   **Q.**  Do you know through your own knowledge that you have held

20   up the process of selecting the A.G. lantern within the

21   railway marketplace by virtue of you introducing your product

22   into the market?

23   **A.**  Are you saying the railroad industry when you say Rail

24   Marketplace, or are you talking about Rail Marketplace the

25   entity?

1    **Q.**  Rail Marketplace?

2    **A.**  The entity, the company called Rail Marketplace, Inc.?

3    **Q.**  Let's start with that one, bad question.

4    **A.**  I'm sorry, I have to hear that again.

5           COURT REPORTER:  "Question:  Do you know through your

6    own knowledge that you have held up the process of selecting

7    the A.G. lantern within the railway marketplace by virtue of

8    you introducing your product into the market?"

9    **A.**  No, I did not know that.

10   BY MR. CHRISTIE:

11   **Q.**  Do you know whether or not you are holding up the

12   selection of the A.G. Design lantern by other individual

13   railways as a result of introducing your lantern into the

14   marketplace?

15   **A.**  No, I am not aware of that either.

16   **Q.**  Is it your belief that you have not in any way affected

17   the selection of A.G. Design lanterns by any railroad industry

18   as a result of you introducing your product into that

19   marketplace?

20   **A.**  I would hope I didn't, but I don't know for sure.

21   **Q.**  Would it shock you if you had?

22   **A.**  How would I know that?

23   **Q.**  No one has told you they are evaluating your lantern along

24   with A.G. Design's lantern for selection?

25   **A.**  Yes, now that's a yes.

1    **Q.** And wouldn't that make it obvious to you that you are

2    holding up the selection of A.G. Design because they are

3    considering your lantern?

4    **A.** No, not at all. I thought the testing process with Rail

5    Marketplace was an ongoing competitive "may the best lantern

6    win" type of scenario. I thought we started at the same time,

7    and whoever crossed the finish line would win the accounts.

8    **Q.** Worth millions?

9    **A.** I have no idea.

10   **Q.** You really don't have any idea?

11   **A.** No.

12   **Q.** Hundreds of thousands?

13   **A.** Yes, hundreds of thousands, definitely.

14   **Q.** Of units or dollars?

15   **A.** Dollars, certainly.

16   **Q.** It is certainly your intent, unless this court acts

17   otherwise, to proceed with the marketing and ultimately the

18   sale of your lantern, production and mass sale?

19   **A.** You mean to start mass production and sales?

20   **Q.** Yes.

21   **A.** Yes, definitely.

22   **Q.** That's why you have a web site?

23   **A.** My web site hasn't been working since the technology moved

24   beyond the product that was being advertised on it. So it was

25   suspended months ago.

1  Q.  But if not told to do otherwise by this court, you would

2  expect to market throughout the United States and Canada, and

3  perhaps globally, your product, correct?

4  A.  Well, not globally.  And certainly we would hope -- it

5  would be our hope to market our product in the United States

6  and Canada.

7  Q.  In the exact same market that A.G. Design is selling their

8  product in; is that correct?

9  A.  In the railroad industry, yes, but not with the same

10  product.  We sell an entirely different technology than A.G.

11  Design has or is selling according to what I understand.

12      MR. CHRISTIE:  That's all I have, Your Honor.

13      THE COURT:  All right.  Mr. Coulter.

14               CROSS-EXAMINATION

15  BY MR. COULTER:

16  Q.  Okay, Marcus, I would like to get back to Plaintiff's

17  Exhibit 9, again, which is the non-exclusive sales

18  representative agreement?

19  A.  Okay.

20  Q.  Turning to the last page, which you've testified that

21  looks like your signature?

22  A.  Yes.

23  Q.  Is there any date on the last page?

24  A.  No, and that's why I don't recall having signed this.

25  Q.  Now, look on the first page.  What is the date on the

1  first page?

2  **A.** April 1, 2003.

3  **Q.** Do you recall meeting with Mr. Herrington on that day?

4  **A.** No.

5  **Q.** Do you have any idea what you could have been doing that

6  day?

7  **A.** Yes.

8        MR. CHRISTIE:  Objection, calls for speculation.

9        THE COURT:  He can answer if he can.

10 **A.** Yes, I know exactly what I was doing.

11 BY MR. COULTER:

12 **Q.** What were you doing?

13 **A.** I was with my son, his birthday is on April 1st.

14 **Q.** This is Jason?

15 **A.** Middle one, Justin.

16 **Q.** So you would be pretty fairly certain where you were?

17 **A.** I would be very certain where I was on April 1st.

18 **Q.** And you did not sign the agreement in this form?

19 **A.** That's correct.

20 **Q.** Marcus, I would like you to take a look at Exhibit A-15,

21 Defendants' Exhibit.  Do you have it?

22 **A.** Yes.

23 **Q.** Can you tell me what it is?

24 **A.** It's a facsimile transmission I sent to Al Herrington on

25 April 30, 2003.

1   Q.   You sent it on April 30, 2003?

2   A.   Yes.

3   Q.   What is the substance of this fax?  Why did you send it?

4   A.   Mr. Herrington sent me, after, I believe nearly a year of

5   selling his railroad lanterns, which I now understand are just

6   prototypes, but I was selling his lantern products for almost

7   a year, and then he sent me and asked me to sign this, a copy

8   of a non-exclusive sales representative agreement, whereby I

9   would be paid 6 percent commission.  I was earning 8 percent

10  before he wanted me to sign this agreement for 6 percent.

11       And then after the date, April 1, that he says I signed

12  it, I continued to get 8 percent commission.

13       The document called into question some wording on the

14  agreement that if I were to sign it and execute the agreement

15  as it was written, I would have already been in violation of

16  the agreement before I signed it, since I was doing the exact

17  duties that the agreement prevented me from doing.

18  Q.   Okay.  Does the language proposed appear in the agreement

19  that you signed?

20  A.   Yes.  It has Mr. Herrington's wording that appeared on the

21  document he wanted me to execute.  And I wrote back to him and

22  asked him how about this, can we change it to this.  Please

23  run it by your attorney and get back to me, and we will sign

24  it by Thursday.

25  Q.   Marcus, can you take a look at page 2 of this exhibit.

1   Can you tell me what this document is?

2   **A.**  Well, I hadn't received a response from Mr. Herrington, so

3   on May 14, 2003, I faxed Mr. Herrington another request

4   regarding my April 30 fax saying I haven't received anything

5   from you about my changes that I suggested.  So what,

6   basically what are we going to do, where are we going to go

7   from here.

8   **Q.**  Did you receive a response from this?

9   **A.**  No.

10         MR. COULTER:  Your Honor, I move to admit Exhibit

11  A-15.

12         MR. CHRISTIE:  Object to both of them.  There's a

13  lack of foundation that these were ever sent.  They contain a

14  fax header line indicating they were faxed on April 25, 2007.

15         MR. COULTER:  Your Honor, we have a declaration from

16  the defendant saying that he faxed these on this day.  It's

17  under penalty of perjury.  This is an older fax.

18         THE COURT:  I will look at them for the purposes of

19  this hearing.

20     (Defendants' Exhibit No. A-15 received in evidence.)

21  BY MR. COULTER:

22  **Q.**  So moving on to take a look at Defense Exhibit A-16, the

23  next document marked.

24  **A.**  Yes.

25  **Q.**  Can you tell me what this document is?

**A.**   This was a series or exchange of emails from myself and

Mr. Herrington sometime in September 2004 where -- because

Mr. Herrington and I were involved in litigation of my former

employer, who helped Mr. Herrington develop his rechargeable

battery, I wanted to know exactly, since I did not hear back

from my faxes, I did not sign any agreements with

Mr. Herrington.  I wanted to confirm with Mr. Herrington

whether or not we had any agreements whatsoever, nondisclosure

agreements, employment agreements, any agreements between us,

because I felt it was important whether or not we did.

     And Mr. Herrington wrote back to me and said:  Just for

the record, you have never been an "employee" of A.G. Design

now or in the past.  That I worked as an independent

salesperson to sell trainman lanterns.  I was being paid on a

commission bases upon performance.  As for a written

agreement, we did draw up a non-exclusive agreement but this

was never signed or put into effect.

     And I took Mr. Herrington at his word.

**Q.**   What is the date of this email?

**A.**   September 16, 2004.

          MR. COULTER:  Move to admit.

          MR. CHRISTIE:  No objection, Your honor.

          THE COURT:  Admitted for the same reason.

     (Defendants' Exhibit No. A-16 received in evidence.)

BY MR. COULTER:

1    **Q.**  Could you take a look at defense Exhibit A-6?

2    Can you tell me what is this, first of all?

3    **A.**  One is a letter I wrote to Rita Scott who was the

4    procurement manager at CSX Transportation, October 9, 2002.

5    **Q.**  What's the next one?

6    **A.**  The other one is --

7                THE COURT:   What Exhibit is this?

8                MR. COULTER:   This is our Exhibit 7, A-7.

9    **A.**  The second document -- I am sorry, do I have the right

10   one?

11   **Q.**  What are you looking at?

12   **A.**  A-6.

13   **Q.**  That is a letter to Rita Scott?

14   **A.**  To Rita Scott.  Then there's another one that was

15   involving CSX reverse auction, around October of 2002.

16   **Q.**  Okay, well that's the one we want.  So we will be looking

17   at Defendants' Exhibit No. 7 and 6, the one you started to

18   explain.

19   **A.**  A-6?

20   **Q.**  Yes.

21   **A.**  Then there are two, there are also two product promotional

22   fliers or sheets, product sheets.  And there is the official

23   CSX version of our description of the A.G. Design CSXT

24   lantern.  It was a pre-qualifying sheet for a reverse auction

25   that CSX held.  Again, this was in 2002.

1    **Q.** Okay.  So in October 9, 2002, you sent a letter to Rita
2    Scott, and in that letter it included the information about
3    the Titan V trainman lantern?
4    **A.** Rechargeable trainman lantern.
5    **Q.** And the sheet about the new advanced features of the
6    trainman lantern?
7    **A.** Correct, how the rechargeable batteries could save
8    thousands of dollars.
9    **Q.** Can you take a look at the new advanced features of the
10   trainman lantern brochure and tell me whether or not this
11   included any elements that are in the patent of A.G.?
12   **A.** I am sorry, I have two versions.  I have --
13   **Q.** I have two versions as well, let's so start with the first
14   one.
15   **A.** The first one, yes, the new quad-beam reflector system
16   keeps workers safe and more visible.
17   **Q.** What are the quad-beam reflector system?
18   **A.** Ports in the reflector.
19   **Q.** And when did you send this?
20   **A.** This would have been made available first part of 2003,
21   possibly the end of 2002.
22   **Q.** This last sheet of paper, or the last two pieces that you
23   referred to, I am sorry, the pre-qualifying sheet?
24   **A.** Yes.
25   **Q.** Can you tell me about this?

**A.** Yes, it's a fax, Excel spreadsheet -- let me say that again. It is an Excel spreadsheet that CSX sent out as a pre-qualifying application form to Star and to A.G. Design back in 2002, requesting that we put down exact product descriptions and corresponding manufacture part numbers so that they would have a better idea that they were actually getting quotes and bids from like products.

**Q.** Okay. So these quotes, and the ones that we have compatible part description, and they are looking for parts that are compatible with the parts that are on the left-hand side, so we've got "description" on the left-hand side and then "compatible part description" on the right-hand side.

THE COURT: Put that on the screen if you are going to refer to it.

MR. COULTER: Move to admit.

MR. CHRISTIE: I object, Your Honor, there's not a foundation that this is a document that has anything to do with the issues in this case.

THE COURT: Tell me -- you seem like you are approaching now the agreement. Is that what you are trying to do?

MR. COULTER: What I am doing is I am establishing when the lantern that included the ports and the claims of A.G. was first sold in the United States.

THE COURT: We are talking about the same lantern?

1          MR. COULTER:  Yes.

2          THE COURT:  I am having trouble following wherever

3    you are.  You are flipping papers and you are saying

4    something.  If you are referring to an exhibit, tell me what

5    the exhibit is, tell me what page number you are on, and if

6    there's a line number, I appreciate that.  I need to keep up

7    with you where ever you are and whatever you are doing there.

8          MR. COULTER:  I apologize.  It is our Exhibit 6.

9          THE COURT:  Okay, I have 6, and then I have a letter

10   to Rita.  Then you mentioned some other parts to something.

11         MR. COULTER:  With this letter to Rita, then follows

12   after it three different pieces of material.

13         THE COURT:  Why don't you get them in some kind of

14   order?  We will take the afternoon recess.  Let's get some

15   order so I can understand where you are going.

16         THE CLERK:  All rise, court is in recess.

17     (Afternoon recess.)

18         THE COURT:  You may be seated.

19     Let me say this, as to the lantern in terms of this

20   particular proceeding, I have heard I think all I need to hear

21   in terms of this court making a decision.  I have to go back

22   and look at some of these things.

23     So the only other issue that I can see that maybe you

24   could put some sort of a rest to would be this agreement that

25   covers a period of time, and so let's close it out with that.

1    Then I will hear from you making your presentation, but I

2    don't think I need to hear anything else as to this issue and

3    whether this impacts it somehow or even becomes necessary

4    becomes another issue.  Right now we are talking infringement

5    at least to the point of something here that indicates an

6    injunction should issue, and then we have another day set

7    aside to hear the matter and try the matter.

8        So with that in mind, let's see if we can wrap it up.

9            MR. COULTER:  So Your Honor wanted to end it with the

10   exclusive sales agency agreement?

11           THE COURT:  All I am suggesting to you, I've heard

12   all I need to hear about the product.

13       What I need to hear now is whatever you want to tell me.

14   I think that's where you are going with this, as to when the

15   agreement was entered into or whether one was entered into at

16   all.  Is that where you are going?

17           MR. COULTER:  We thought we had submitted everything

18   that established --

19           THE COURT:  No, your line of questioning, is that

20   where you are going?

21           MR. COULTER:  We were heading towards when the first

22   sale of the A.G. lantern was in the U.S.

23           THE COURT:  All right.  I can give you until 4:30.

24           MR. COULTER:  I will wrap it up in five minutes.

25   BY MR. COULTER:

1  Q.  All right, Marcus, referring to Exhibit A-6.  Could you go

2  to page No. 6 and 7, the final two pages?

3          THE COURT:  This is Exhibit --

4          MR. COULTER:  A-6, page 6 and 7.

5          THE COURT:  And the page?

6          MR. COULTER:  Page 6 and 7.

7          THE COURT:  All right.  Go ahead.

8  BY MR. COULTER:

9  Q.  Marcus, could you tell me what this document is?

10  A.  Yes, it's a pre-qualifying sheet that was sent to all

11  potential lantern vendors for the railroad from CSX

12  Transportation in Florida, and this was in preparation for

13  what they call a reverse auction bid process, where the lowest

14  bid most likely would get CSX's business.

15  Q.  And you prepared this document?

16  A.  Yes, I prepared the description that's written on the

17  document.

18  Q.  Okay.  Can you tell me on this document which compatible

19  part number is the trainman lantern that you were selling in

20  2002, 2003?

21  A.  The 992-321-A.G.

22  Q.  Is there a product number on the prototype lantern in

23  front of you on the stand?

24  A.  Yes.

25  Q.  What's that number?

1    **A.**  It's the rechargeable version, 992-321-A.G.

2    **Q.**  Does it say anything else on the prototype?

3    **A.**  On the qualifying sheet?

4    **Q.**  On the lantern itself?

5    **A.**  It says A.G. Design & Associates, Inc., P.O. Box 225,

6    Greenbank, Washington, 98253, patent pending, 1999.

7    **Q.**  Patent pending, 1999?

8    **A.**  Yes.

9    **Q.**  And the same number appears on there as appears on this

10   pre-qualifying sheet?

11   **A.**  The model number, yes.

12          MR. COULTER:  I move to admit the pre-qualifying

13   sheet.

14          MR. CHRISTIE:  Objection on the grounds of relevancy.

15   This has to do with information he put on a sheet that relates

16   to a prototype that isn't even in evidence.  It has nothing to

17   do with first sale of the patented device.

18          THE COURT:  Is that correct?  Is this the patented

19   device we are talking about here?

20          MR. COULTER:  This is the prototype patented device,

21   the device that they claim was under experimental development

22   at the time.  We are demonstrating that it was actually being

23   sold in 2002, 2003.

24          THE COURT:  All right.  Go ahead.  I don't know what

25   this is going to do for me here, but I am going to give you a

1   chance, Mr. Christie, to go into that.

2          MR. CHRISTIE:  Thank you.

3      (Defendants' Exhibit No. A-6 received in evidence.)

4   BY MR. COULTER:

5   **Q.**  Mr. Mukai, could you take a look please at Exhibit A-7.

6   **A.**  Yes.

7   **Q.**  Can you tell me what this is?

8   **A.**  These are purchase orders from CSX Transportation, in

9   Florida.

10  **Q.**  When were these purchase orders issued?

11  **A.**  February 26, 2003.

12  **Q.**  Were they issued as a result of the marketing materials

13  that you sent to them, from the previous exhibit?

14  **A.**  Yes.

15  **Q.**  Were these for the patented device that contained the

16  ports?

17  **A.**  They contained ports, yes.

18         MR. CHRISTIE:  Object as nonresponsive, Your Honor.

19  The question was whether this related to the patented device.

20         THE COURT:  I think that's the question.  Is that

21  this?

22         THE WITNESS:  Yes.

23         THE COURT:  This is Exhibit 7?

24         MR. COULTER:  Yes, sir, A-7.

25         THE COURT:  All right, I will give you a chance,

1    Mr. Christie, to go into it.  He says it is.  I can't tell.

2        Where is the date on this purchase order?  Is that the

3    2-26-03?

4            THE WITNESS:  Yes.

5        (Defendants' Exhibit No. A-7 received in evidence.)

6    BY MR. COULTER:

7    Q.  All right, Mr. Mukai, can you sum up briefly in your own

8    words what are the differences between your product and that

9    of the device?

10   A.  Okay.  First of all, this is not the product -- our

11   product as it is.  This is an old -- probably close to a year,

12   maybe eight months old, early prototype version.

13       On Your Honor's desk --

14   Q.  Did you submit that early prototype to the railroads?

15   A.  Yes, for testing.  But it is not the lantern that is in

16   the heat of the competition today.

17       The technology has moved beyond the incandescent filament

18   bulb.  And that's why we don't have ports in our reflector,

19   because the LED shines sideways out the bottom, out the sides

20   of the LED.

21   Q.  So then ports are useless?

22   A.  Ports are detrimental to the forward motion of the light

23   beam reflected from the bulb or the deepest part of the

24   reflector.

25       In addition, we don't use krypton or filament bulbs in our

lantern except as an emergency backup in case the LED fails, which is not very likely, which is another reason we have a permanent or semi-permanent lens cover, a polycarbonate lens cover over the reflector to protect that very expensive LED.

It's the LED bulb that is the leap in technology for these railroad lanterns. And that is the technology that is being tested today in all the lanterns that have been submitted.

I am not aware that A.G. Design still has an LED version being tested openly at the railroads today. I just don't know that.

But I do know that railroads are actively testing our version of an all LED lantern that uses 25 percent of the energy on an hourly basis. That is a huge advancement in this type of lighting.

**Q.** So how does that compare to the patented device?

**A.** Again the patented device needs augmentation in the signal area, because they reduce the number of LEDs on the side lights from four to three in order to conserve power consumption of the krypton gas bulb. But they didn't look at replacing the krypton gas bulb which burns, with the other LED, nearly a thousand milliamps worth of current per hour.

Ours on the other hand burns, with the LED bulb and the four side LEDs, burns less than 400 milliamps per hour.

**Q.** So it's more energy efficient?

**A.** Greatly more energy efficient, and something that's going

1  to reduce the number of batteries that go into our lantern.

2          MR. COULTER:  Thank you, no further questions.

3          THE COURT:  All right.

4          MR. CHRISTIE:  I will be brief, Your Honor.

5     First of all, did the court admit Exhibit 6, pages -- this

6  was the last two pages of that, I don't even know if they were

7  offered.  I won't bother spending time on them if they haven't

8  been offered, or Exhibit 7?

9          THE COURT:  I don't remember -- well, I have -- this

10  is A-7 or 7?

11          MR. CHRISTIE:  A-7.

12          THE COURT:  How many pages do you have on A-7?

13          MR. CHRISTIE:  A-7 was two pages.  It's the CSX,

14  purportedly the CSX purchase order.

15          THE COURT:  Right.

16          MR. CHRISTIE:  I wasn't sure if that was moved.  I

17  don't want to go into documents that haven't been admitted.

18          THE COURT:  I think I admitted A-7.  Then what's the

19  other one?

20          MR. CHRISTIE:  The last two pages of A-6 were this

21  spreadsheet looking document.

22          THE COURT:  Yes.  Go ahead.

23          MR. CHRISTIE:  All right.  Thank you, Your Honor.

24                   REDIRECT EXAMINATION

25  BY MR. CHRISTIE:

1  Q.  Mr. Mukai, if you look at the last two pages of A-6,
2  please.
3      That is something that you filled out, correct?
4  A.  Yes, I filled it out.
5  Q.  You never shared this with Mr. Herrington, correct?
6  A.  No, that's not correct.  Of course I shared it with him.
7  Q.  Do you have any proof of that?
8  A.  I am sorry?
9  Q.  Do you have any proof of that?
10 A.  No, I don't have any proof that I shared it with him,
11 other than he made all the decisions on whether or not we
12 would participate in a bid of his products to a major
13 railroad.
14 Q.  Nothing about the reference in this particular document
15 pertains to the patented device, correct?
16 A.  No, I don't believe that is correct.
17 Q.  This has everything to do with the prototype that you
18 brought into court today, correct?
19 A.  The plurality of lenses are holes in the reflector.
20 Whether the holes are round marbles or flat lenses, they are
21 still ports in the reflector which are the holes that were cut
22 out to transfer light into the signal area.
23 Q.  Can you answer my question, sir.  The reference in here to
24 a device is to the prototype device that you brought into
25 court with you that has round balls glued into three holes in

1    the lens; am I correct?

2    **A.**   No, actually there's four holes; but yes, it references a

3    lantern with those reflector beams in the reflector.

4    **Q.**   The balls?

5    **A.**   Yes.

6    **Q.**   Which is not the patented device?

7    **A.**   Again --

8    **Q.**   Yes or no.

9    **A.**   -- I don't know what the patented device is now.

10   Plurality of ports and reflector with lenses, I mean round,

11   flat, square, to me that is the patented device.

12   **Q.**   My question is not that complex.  The state of development

13   of the product at the time you filled this out was the

14   prototype that you brought in with you that had round balls

15   glued into some holes in the lens; am I correct?

16   **A.**   It was a version of it, yes.

17   **Q.**   It was that version of it, correct?

18   **A.**   Well, no, there were many more, counselor, than this, than

19   the four or six that you told me were developed.

20       This was not an experimental product.  This was a product

21   being advertised and being offered for sale.  I know, because

22   I got numerous numbers of them back with the balls that have

23   fallen out of the reflector; hence the design change to a flat

24   lens.   That's the difference.

25   **Q.**   I think you are misunderstanding my question.  I will try

1    and rephrase.

2    **A.**   Okay.

3    **Q.**   I don't mean the specific prototype lantern sitting in

4    front of you now.  I mean that the reference in this exhibit

5    to a lantern is one in the state of development exactly like

6    the prototype that you brought in with you; yes or no?

7    **A.**   Yes, we were selling this or a version of this lantern.

8    **Q.**   Yes or no.

9    **A.**   Again, counsel, not the one sitting on the table.

10           MR. CHRISTIE:  Your Honor, respectfully, can he

11   answer my question and I will move on?

12           THE COURT:  Do you understand the question,

13   Mr. Mukai?

14           THE WITNESS:  I believe I do.  He's asking me if this

15   particular lantern is the one that is mentioned in the

16   materials for CSX.  I don't know if this singular particular

17   lantern is.  I just know there were a lot of them, and I was

18   selling them.

19           THE COURT:  Well, if they made one, then the rest of

20   them followed that, wouldn't they all look alike?

21   BY MR. CHRISTIE:

22   **Q.**   I broadened my question.  I wasn't isolating that lantern,

23   that single physical lantern.  I was talking about the state

24   of development of that lens, with round balls in it.  That's

25   what we are talking about.  That's what you are talking about

1  in this document, A-6, correct?

2  **A.**  Yes, probably.

3  **Q.**  Thank you.  Now, I want to talk briefly about Exhibit A-7,

4  the CSXT purchase order.  There's a reference on it to the AG

5  Basic Model on the second page.  Do you see that?

6  **A.**  What page?

7  **Q.**  A-7, the second page, there's a reference to the item at

8  issue in this purchase order is the AG Basic Model.  Do you

9  see that?

10  **A.**  Yes.

11  **Q.**  What was the AG Basic Model?

12  **A.**  I recall the basic model, I believe, was a paired down

13  version of the current lantern that A.G. was selling in order

14  to meet a specific price point with CSX.

15  **Q.**  It was not the patented device, correct?

16  **A.**  I guess my confusion is what you are referring to as the

17  patented device.  I don't have your patented device to compare

18  it with.  I don't have one in my hands.  I have never seen it.

19      MR. CHRISTIE:  Your Honor, if you don't mind, could

20  he have the exemplar that we've had admitted into evidence,

21  the patented device?  It's just the orange one right there,

22  Your Honor.

23  BY MR. CHRISTIE:

24  **Q.**  Mr. Mukai, that is not a basic model, correct?

25  **A.**  Correct, this is not a basic model.

1  Q.  So it is not -- what you are holding -- the patented

2  device is not the subject matter of this purchase order

3  Exhibit A-7?

4  A.  Correct, if this is the patented device.

5  Q.  That's all I have on that, thank you.

6      Two other questions.  Is Wai Kit your agent for

7  manufacturing?

8  A.  You know, I don't know what that basic title is.  I don't

9  know.

10  Q.  Who is your agent for manufacturing?

11  A.  Well, I am not familiar with that manufacturing term, I

12  guess.  She is our contact in China for manufacturing of our

13  lanterns.

14  Q.  Do you know who makes your lanterns?

15  A.  Again, it's a composite of several different companies

16  that make, such as the handle.  And then someone else makes

17  and forms the body.  Someone else make all the hardware.

18  Someone else make the reflector.  And then yet someone else

19  makes the wire harnesses, the light bulbs, the LEDs, the

20  circuit board assemblies.

21      So there are many different hands in this.  And I could

22  not begin to tell you how many different companies in

23  Schezhen, in Hong Kong, that produce all of the components

24  that go into these lanterns.

25  Q.  Is she also your contact, since you are comfortable with

1  the word "agent", is she your contact for design?

2  **A.**  Yes, she'd probably be the closest person.

3  **Q.**  Who assembles your lanterns?

4  **A.**  I hold Wai Kit responsible for any errors in assembly, but

5  again, I can't tell you the specific name of one facility.

6  They use many different facilities, depending on the

7  availability of their workers.

8           MR. CHRISTIE:  Your Honor, I think I am done, I just

9  want to be clear for the record it was only the last two pages

10  of A-6, 6 and 7 that were offered and admitted, I believe.

11  Could I just confirm that?  If so, I am not going to ask any

12  other questions about any other pages.

13           THE COURT:  The numbers again.

14           MR. CHRISTIE:  Exhibit A-6, which is multipage, I

15  think there was only a motion to admit the last two pages.

16           THE COURT:  I think the whole exhibit is admitted.

17           MR. CHRISTIE:  Then I need to ask just a couple more

18  questions and then I am done, Your Honor.

19  BY MR. CHRISTIE:

20  **Q.**  Could you look at A-6, please do you have the first page

21  in front of you?

22  **A.**  Yes.

23  **Q.**  This is your, purportedly an October 9, 2002 letter.  Do

24  you have that?

25  **A.**  Yes.

1   **Q.**  Do you have a signed version of this?

2   **A.**  A signed version?

3   **Q.**  Yes.

4   **A.**  No.

5   **Q.**  Or did you send it unsigned?

6   **A.**  No, this is something that would accompany the product.

7   **Q.**  Who created the letterhead?

8   **A.**  Well, the logo is A.G. Design.

9   **Q.**  Who created the letterhead?

10  **A.**  I put the logo on, well, the word document to make it look

11  like a letterhead.

12  **Q.**  Do you have the original of this document in electronic

13  form stored on your computer or any electronic storage device?

14  **A.**  Probably not.

15  **Q.**  Where did this come from?

16  **A.**  All the files that I had, which weren't many after four

17  and a half, five years.

18  **Q.**  Where are those now?

19  **A.**  My attorney has them.

20  **Q.**  There's a reference in the second paragraph to the three

21  spot beams for added signal visibility.  I am correct in

22  stating that the three spot beam reference is to the prototype

23  that had three balls glued in it, am I not?

24  **A.**  If you want to call them prototypes, yes.

25  **Q.**  The lantern with the three balls glued into it?

1  **A.**  Yes, there were three balls initially glued into the ports

2  of the reflector.

3  **Q.**  That's what's being discussed here, correct, in this

4  letter?

5  **A.**  Yes.

6  **Q.**  You never sent a copy of this letter to Mr. Herrington,

7  correct?

8  **A.**  I shared most, if not all, documents with Mr. Herrington.

9  **Q.**  Do you have any memory of ever sharing that specific

10 documents with Mr. Herrington?

11 **A.**  No, only that I shared all pertinent documents with

12 Mr. Herrington.

13 **Q.**  If you look at the third page of this Exhibit, this is a

14 flier entitled "A.G. Design Titan III Trainman Lantern"?

15 **A.**  I am sorry, which page?

16 **Q.**  Page 3 of the exhibit.

17 **A.**  Yes.

18        MR. CHRISTIE:  That's this document here, Your Honor.

19        THE COURT:  This has been numbered as page 4.

20 BY MR. CHRISTIE:

21 **Q.**  You created this, correct?

22 **A.**  Well, yes, with Mr. Herrington.

23 **Q.**  All the words here, the format, everything about this is

24 your creation, correct?

25 **A.**  Yes, as far as basic layout and wording and bullet points,

1   yes.

2   **Q.** You have no knowledge of Mr. Herrington providing any

3   input into this document, do you?

4   **A.** As a matter of fact, yes, I do.

5   **Q.** What input did he have?

6   **A.** Well, again, this was an ongoing process to develop these

7   kinds of marketing materials. A.G. Design never had any

8   marketing materials until June of 2003 when I helped them

9   design a color one sheet product sheet.

10      So this was a product sheet that predated the official

11   color version that I believe Mr. Herrington made either 5 or 7

12   or 8,000 copies of. I just couldn't afford to make that

13   number of copies on my color printer because we were going to

14   do a mass mailing June of 2003.

15   **Q.** My question was simple, what input did Mr. Herrington have

16   on this document if anything?

17   **A.** Well, as an example, we talk about calling this something

18   other than just a rechargeable trainman lantern. Give it a

19   specific name, like a Titan V was kind of cool because it was

20   like a rocket. Kind of suggested a lot of power. Infinite

21   energy. Safety being built into every advanced trainman

22   lantern. Just the buzz words that he and I would talk about

23   and discuss over the course of weeks, if not months, that we

24   were working with these products.

25   **Q.** So no marketing materials were actually available on the

1  product in final form until June of 2003, correct?

2  **A.** No, I said no marketing materials that I know of were in

3  the possession of A.G. Design. I had seen some -- I can't

4  even remember seeing any on the new lanterns or on these type

5  of trainman lanterns.

6  **Q.** Let me make this point clear. Until June of 2003 to your

7  knowledge, A.G. Design itself had no marketing materials for

8  the trainman lantern; is that correct?

9  **A.** We certainly did have marketing materials, quite a bit,

10  but Al and I worked on it and I created those, because there

11  were no existing marketing materials with A.G. Design until, I

12  believe, around June of 2003.

13  **Q.** Let me direct you quickly to Exhibit 7 in the plaintiff's

14  materials that's been admitted.

15      I am sorry, I said 7 and I meant 11. I am sorry.

16      Do you have that in front of you sir?

17  **A.** Yes.

18  **Q.** This is a June 4, 2003 fax to Mr. Herrington that encloses

19  a .pdf of a marketing document for the trainman lantern, the

20  second page of the exhibit is this document, correct?

21  **A.** That's correct.

22  **Q.** You first saw this in June of 2003 when Mr. Herrington

23  sent it to you and requested your input on it to put it in

24  final form, correct?

25  **A.** You mean this specific sheet?

1  **Q.**  Yes.

2  **A.**  Yes.

3  **Q.**  And you provided input to him by way of a fax dated June

4  5, 2003, correct?  If you want to look at Exhibit 12,

5  plaintiff's 12 -- Plaintiff's Exhibit No. 12, please.

6     Could you confirm to me this is your June 5, 2003 fax to

7  Mr. Herrington providing input on the flier that we just

8  looked at?

9  **A.**  Correct, it is.

10       MR. CHRISTIE:  That's all I have, Your Honor.  Thank

11  you.

12       THE COURT:  All right.  Are we through with this

13  witness?

14       MR. COULTER:  I don't have anything further.

15       THE COURT:  You may step down.

16    Mr. Coulter, anything else to present?

17       MR. COULTER:  No.

18       THE COURT:  All right.  Are we ready at this time to

19  have argument?

20       MR. CHRISTIE:  I am ready to proceed, Your Honor.

21       THE COURT:  All right.

22       MR. CHRISTIE:  Your Honor, through our written

23  materials and our submission and testimony to you today, I

24  submit that we have fulfilled the requirements of Rule 65 for

25  obtaining a preliminary injunction against Mr. Mukai and his

1    company from the further marketing their planned production
2    and sale of what is clearly an infringing device.
3        This comes in the context of a business relationship that
4    allowed Mr. Mukai unfettered access to all of the internal
5    workings, the confidential business information of A.G.
6    Design, done in a trusting relationship which he has now
7    disregarded, flagrantly, in the worst kind of fashion and is
8    now outsourcing this product for production by some people who
9    he can't even identify in China.
10       He has tried to tell this court that he has a product
11   that's different.  And the product in evidence, the prototype
12   in evidence is identical, with the exception of ports which we
13   won't belabor other than to say they are clearly insignificant
14   to the functionality of the lateral light system.
15       He acknowledges that and concedes that, and it is clear by
16   virtue of the fact that he markets and sells his product
17   without that feature, including the one that you have here
18   with an incandescent bulb.
19       I am very aware of the Festo case, which I am sure this
20   court will look at or has looked at.  It does talk about the
21   interplay between the doctrine, the two critical doctrines we
22   are talking about here; the Doctrine of Equivalents and the
23   concept of prosecution history estoppel.
24       Their argument, frankly, it is disingenuous to argue that
25   these two lanterns, with the exception of the ports, are not

1    identical; they are, in its feature, form, function, geometry,
2    configuration.
3        The prosecution history estoppel can come into play if
4    there's been a change in the prosecution history that has
5    given something up.  I submit there's no showing that anything
6    has been given up.  But more importantly, what Justice Kennedy
7    told us in that case, is that any presumption that arises from
8    prosecution history can be overcome if it can be demonstrated
9    one of three ways.  The one that is relevant here is whether
10   or not the rationale underlying the amendment may bear no more
11   than a tangential relationship to the equivalent in question.
12       The functional equivalent that we are talking about in
13   both lanterns is the creation of a lateral beam through the
14   use of LEDs placed circumferentially around the base and
15   positioned in a way such that their light reflects off a
16   reflective surface and reflects out through this pebbled
17   surface, all of which are described in the patent.  That is
18   identical in both down to the pebble.
19       Clearly, I think the testimony for purposes of a
20   preliminary injunction demonstrates to you that the patent is
21   valid.  That the concept of the Doctrine of Equivalents
22   applies.  That the exception to the argument of prosecution
23   history estoppel is present.  That there is no more than a
24   tangential relationship of these ports to the functionality of
25   this lantern.  So we believe we've met our burden in that

1  regard.

2      The argument that there is a first sale is a hollow

3  argument.  There is not any proof in this record of a first

4  sale of the patented device prior to what Mr. Herrington

5  testified to, which was June of 2004, less than a year after

6  the patent application was made in May of 2003.

7      The other factors that we believe we have demonstrated are

8  those of irreparable harm.  Apparently, as Mr. Mukai describes

9  it, there would be no harm whatsoever because he's not even

10 marketing the device we are talking about here.

11     The balance of the hardships clearly are in favor of

12 Mr. Herrington.  He has invested thousands of dollars and

13 years of design work in perfecting the lantern that he has

14 marketed and sold and is carried by literally thousands of

15 trainmen across this country.  Mr. Mukai has six prototypes he

16 claims.

17     I think the most profound statement of the nature of the

18 damage that Mr. Mukai has done to the market comes from the

19 last page of his own declaration filed in opposition to this

20 motion, because he described in there how he has invaded the

21 exact market, the exact and precise market that Mr. Herrington

22 is working in.  And I ask the court to take a look at that

23 last paragraph of his own declaration, which documents that

24 unequivocally.

25     He has invaded a market that he learned about and met

1   through Mr. Herrington.  He knows nothing about engineering

2   design other than what he has learned vicariously.

3       He is, I submit, a pariah on the field of intellectual

4   property and patent work and invention, by ripping off

5   someone's design, someone that he met in a trusting way and is

6   now attempting to remove the inventor of this product from

7   that market and damage him permanently.

8       Mr. Mukai says, in his own declaration, that their

9   business is at risk because they may lose the largest

10  railroads in the United States, all of which are actively

11  testing, testing his device against Mr. Herrington's device.

12      And any argument that his device is so completely

13  different that a railroad might buy both is absurd and not

14  supported by anything here.

15      We urge the court to grant the motion and enter the

16  temporary injunctive relief.

17      The harm to Mr. Herrington cannot be undone by damages

18  alone.

19      Thank you, sir.

20          THE COURT:  All right.  Mr. Coulter.

21          MR. COULTER:  Your Honor, when we are looking at this

22  issue of a preliminary injunction for purposes of patent

23  infringement, it's a very clear-cut standard.  They have to

24  show that there's likelihood of infringement either literally

25  or by the Doctrine of Equivalents.

1    Essentially they have given up on the fact of literal

2    infringement.  Their own expert testified that it wasn't an

3    exact claim-for-claim copy.  So literal infringement is

4    unavailable to them.

5    They are trotting out some dicta in Festo for the

6    proposition that there's some sort of tangential relationship

7    to the limiting amendments being made to their issued patent.

8    Festo holds very clearly that plaintiff is estopped from

9    certain claims that were voluntarily entered to narrow the

10   claims that resulted in the issued patent.  They narrowed the

11   claims to get the patent.  They are estopped from trying to

12   expand them now.

13   Festo also holds that the plaintiff bringing this action

14   bears the burden of showing that the amendment does not

15   surrender the particular equivalent in question.  They

16   demonstrated absolutely nothing to that effect.

17   The basic element that's going on in this case is

18   essentially greed and envy.  My client has come up with a

19   product that doesn't infringe.  He's gone out of his way to

20   evaluate the patent that was issued and make sure that it

21   wasn't infringing before he even tried to deal with the

22   railroads.

23   The plaintiff hasn't shown literal or equivalent

24   infringement.  And as far as irreparable harm, when he can't

25   show that, there can't be a presumption of irreparable harm.

1    However, Mr. Herrington has been in business for number of

2    years, has looked to sell his business.  We don't even know

3    what sort of investment he has in it, but certainly it's equal

4    to or less than that of Mr. Mukai, who has a new

5    entrepreneurial business he's been developing independently

6    for number of years.

7        The sort of back-sided argument to get around the patent

8    infringement, to come at it through the noncompete issue, it's

9    utterly disingenuous, because there's significant questions as

10   to whether or not there's ever a valid agreement, especially

11   when we can show evidence that it may in fact be fraudulent.

12   There's credibility questions with that agreement that will

13   only be resolved later on.

14       For these reasons, and especially for the reasons of the

15   public interest, for the rail industry, where safety is a

16   paramount concern, and there's a number of products out there

17   that are virtually identical, all of which lack the plurality

18   of ports and all of which lack pebbling and all of these other

19   things that have been brought up by the experts and by the

20   testimony of plaintiff.  However, the patent doesn't cover any

21   of these elements.

22       So if they are allowed to get an injunction to protect

23   elements that are not a part of the patent, then they will be

24   able to assert their patent against a whole branch of people,

25   including people that were cited as prior art for the patent.

1      They haven't met their burden.  It's not in the public

2  interest, and they can't establish irreparable harm

3     For that reason, we'd ask the court not grant this

4  injunction.

5        THE COURT:  All right, before you sit down let me ask

6  you one question to speak of.  Tell me, Mr. Jorgensen, what am

7  I to do with what his testimony is about?

8        MR. COULTER:  I'm sorry?

9        THE COURT:  Dr. Jorgensen, what am I to do with his

10  testimony?

11        MR. COULTER:  His testimony, and we asked him about

12  this, we asked him if he had looked at the patent and then

13  looked at the product.  And he said what he'd done was he went

14  step-by-step to see how the patent was essentially, I guess,

15  approximated by the allegedly infringing device.  But

16  Mr. Jorgensen clearly said that a number of these claims

17  weren't available.  And for literal infringement, every claim

18  must be met exactly.

19     So he established that there can't be a literal

20  infringement.  Festo establishes because of the prosecution

21  history the Doctrine of Equivalent can't apply to this.

22        THE COURT:  All right.

23     Final word.

24        MR. CHRISTIE:  Thank you, Your Honor.

25     Counsel, with some credibility, just conceded that with

1    the exception of the ports, these products are identical.  And

2    there's a reason why they are identical, because Mr. Mukai is

3    a smart man.

4        He knows that Mr. Herrington, through years of trial and

5    error, developed a product that was excellent and was

6    attractive to the very markets that he wants to now take over.

7    So he copied it identically, cheaply, by having it

8    manufactured elsewhere by unnamed individuals.

9        So, it's not just about getting close to the claims.  It's

10   about copying everything.  This is a rip-off in every sense of

11   the word.

12       The testimony by Dr. Jorgensen is unchallenged.  They

13   actually listed him as their own witness in this case, and his

14   conclusions that the dimensions and function of this are

15   identical are unchallenged.

16       We believe a showing has been made that a preliminary

17   injunction should issue and so ask the court.

18       Thank you.

19           THE COURT:  All right.  We will conclude and leave it

20   there, and I will give you folks a written opinion on this.

21       Let me ask you about the two exhibits here, the patent, as

22   well as this.  Any issue with that?  Are those going to hang

23   around with me for a while?

24           MR. CHRISTIE:  I would like you to make sure you get

25   the two I brought into the room.  I don't know if they have

1    actually been physically marked.

2              THE COURT:   This is one of them, I believe.

3              MR. CHRISTIE:   May I approach, Your Honor.

4              THE COURT:   And let's make sure, I think that that is

5    over there.   Let's mark them.

6        This one was to show what they looked like before.   I

7    don't think I need that.

8              MR. CHRISTIE:   I would agree, Your Honor.   That was

9    just for illustrative purposes.

10       This is the one that I brought in that should be marked

11   and entered as Exhibit 2, as the accused device.

12       And this is the one that should be marked as Exhibit 1,

13   the patented device.

14             THE COURT:   All right.

15       (Plaintiff's Exhibit No. 1 and 2 marked for

16   identification.)

17             THE COURT:   Mr. Coal, I will have you come and take a

18   look and make sure you agree with these two exhibits.

19       I believe that's the patent, the orange; and I believe

20   that's the one that was offered there, the one that's got the

21   label on the bottom there, that's the accused.

22             THE CLERK:   I have them marked, Your Honor.

23             THE COURT:   All right.   You are satisfied with these

24   two I should have right here?

25             MR. CHRISTIE:   Yes, Your Honor.   Thank you.

1      (Plaintiff's Exhibit No. 1 and 2 received in evidence.)

2          MR. COULTER:  We would like this one to stay around

3   as well as an example.

4          THE COURT:  That's the patent, I guess.

5          MR. COULTER:  This is the device that was for sale

6   more than three years ago.

7          MR. CHRISTIE:  That's the prototype device we spent

8   some time talking about.

9          THE COURT:  Any issue with that?  Any different than

10  the patent?

11         MR. CHRISTIE:  Yes, that's the one that has the three

12  or four balls glued into it, which is not the patented device.

13         THE COURT:  Did I see that one?

14         MR. CHRISTIE:  I believe that's the one that we talk

15  about patent pending.  That is not the patented device.

16         THE COURT:  No, okay.  I haven't seen this one.

17    So what are you saying?

18         MR. COULTER:  We would like to admit that one as

19  well.

20         THE COURT:  This is the one that was being shown

21  around.

22         MR. CHRISTIE:  Apparently by Mr. Mukai.

23         THE COURT:  All right.  Okay.

24    All right, anything else?

25         MR. CHRISTIE:  Thank you, Your Honor.

1          THE COURT:  All right.  Then I will take those

2   matters and I will give you an opinion.  I will try to get it

3   to you shortly.

4          MR. CHRISTIE:  Thank you, Your Honor.

5          MR. COULTER:  Thank you.

6          THE COURT:  We will be in recess.

7          THE CLERK:  All rise, court is in recess.

8          (Proceedings concluded.)

9                    *    *    *    *    *

10                  C E R T I F I C A T E

11

12      I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.

14

15   /S/  Teri Hendrix _____          August 27, 2007

16   Teri Hendrix, Court Reporter                  Date

17

18

19

20

21

22

23

24

25